**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Khalid Yousaf MALIK,
Defendant-Appellant.**

No. 85–2983.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1986.

Decided Aug. 29, 1986.

See also, D.C., 529 F.Supp. 791.

Michael G. Logan, Chicago, Ill., for defendant-appellant.

Sharon Jones, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, WOOD, and FLAUM, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The defendant, Khalid Yousaf Malik, was charged with five counts centered around a conspiracy to import heroin and its importation.[1] A jury in 1985 found Malik guilty on all counts.[2] Three issues are raised, two of which are substantial. The first concerns the effect on this case of the settlement of a civil habeas corpus action in another district in this circuit where Malik was confined on a previous and distinct heroin charge. The settlement provided for Malik's immediate deportation upon his anticipated release on special parole. The second concerns the admissibility of evidence of Malik's prior conviction on the other but similar heroin charge which subsequently gave rise to the habeas corpus settlement and deportation order. The final issue concerns the propriety of an Assistant United States Attorney conferring during a trial

---

1. Specifically Malik was charged in a five-count indictment with (1) conspiracy to distribute heroin in violation of 21 U.S.C. § 846; (2) conspiracy to import heroin into the United States from Pakistan in violation of 21 U.S.C. § 963; (3) importing 605 grams of heroin mixture into the United States from Pakistan in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2; and (4) knowingly and intentionally using a telephone to facilitate the conspiracy to import heroin into the United States in violation of 21 U.S.C. § 843(b).

2. The district court sentenced Khalid Yousaf Malik to twenty years on Counts One, Two and Three, to be served concurrently. Malik received a suspended sentence on Counts Four and Five and was placed on a five-year period of probation to be served concurrently, but consecutively to the period of incarceration on Counts One, Two and Three. A special parole term of life was imposed on Count Three; and the defendant will be fined $50,000 on Counts One, Two and Three if he fails to leave the United States pursuant to any outstanding order of deportation.

recess with a government witness about the testimony of that witness at a time when the direct examination of that witness had not been completed.

### The Factual Background

In 1981 Malik was convicted in the Northern District of Illinois for heroin offenses very similar to the charges in this case. An interesting sidelight for some may be that Malik arranged for his cousin in Pakistan to ship the heroin to this country in baseballs. That resulted in three fifteen-year concurrent sentences and a special parole term for life, a condition of which was that he be deported back to Pakistan. Initially these sentences were served in a facility in the Northern District of Illinois, and later completed in a federal facility in the Western District of Wisconsin. Malik, apparently being very enthusiastic about the heroin importation business and undeterred by his first conviction, got back into the business while incarcerated. That led to this present conviction.

While incarcerated in Chicago, Malik struck up a friendship with a co-inmate, Michael Locke, who was soon to be released. They talked about heroin and its price in Chicago. After Locke's release in November 1981, Malik pursued his friendship with Locke by telephone. Confinement did not hamper Malik's heroin business. With Locke's help conference calls were arranged connecting Malik with his brother in Pakistan during which he and his brother conversed in their native language. Several lady friends of Locke's assisted with the long distance calls as Malik represented to them that it was about a diamond transaction. One of these friends then agreed to receive a package from Pakistan. After the package arrived, Locke examined the contents and found not diamonds but eight red "cricket-like" balls filled with heroin. Malik and Locke conferred by phone about brokering the heroin, and Locke thereafter made some sales. Later in 1981 another package arrived from Pakistan at another friend's home, and it likewise contained balls filled with heroin.

Locke, according to Malik's instructions, forwarded $60,000 to $70,000 to accounts in Pakistan. Locke was likewise engaged in early 1982 in another heroin transaction arranged by Malik. Malik was, however, then transferred to the other detention facility in Wisconsin, but it was no business setback as Locke was able to visit him there. Other lucrative heroin transactions followed. Malik's brother came from Pakistan and went with Locke to visit Malik. Before returning home the brother collected a large additional cash sum from Locke due and owing from their prior heroin transactions.

Additional transactions followed smoothly until U.S. Customs and Drug Enforcement Administration agents randomly intercepted one of the heroin packages addressed to Locke's home in Chicago. Drug agents placed Locke's home under surveillance and photographed him with Malik's brother who had once again returned from Pakistan. When the next package arrived at Locke's home, Locke was not there, but his brother was. The agents arrested Locke's brother when he opened the package. Locke then began to cooperate with federal authorities. The last time Locke visited Malik in the institution not long before Malik was due to be released on parole, Malik discovered the tape recorder that Locke was wearing.

About this time Malik filed a mandamus petition in the Western District of Wisconsin claiming he was entitled to a prompt deportation hearing pursuant to 8 U.S.C. § 1252(a). Malik's special parole term had provided for deportation. The district court treated the mandamus petition as a petition for habeas corpus. The United States Attorney in Wisconsin, not knowing of the more recent heroin charges, worked out a settlement with Malik, the only pertinent part of which was that Malik would be deported on February 21, 1985. On February 14, 1985, the day before Malik was due to be released on special parole and thereafter deported in accordance with the settlement, the United States Attorney in Wisconsin learned for the first time that the United States Attorney in the Northern

District of Illinois had a warrant for Malik's arrest for his later heroin transactions.[3] That put a hold on the settlement deportation. Malik then petitioned the Wisconsin district court to immediately enforce the deportation settlement or to reopen the habeas corpus matter. Judge Crabb refused to do either. Soon thereafter Malik was indicted in Illinois, and by motion endeavored to have that indictment dismissed on the grounds that the Wisconsin settlement had preempted the later indictment. Judge Hart in Illinois denied the motion.

## Analysis

### A.

The first issue is Malik's attempt to relitigate and enforce in Illinois the Wisconsin habeas corpus deportation settlement as a basis for dismissing the Illinois indictment. The basic issue and the parties were the same in both instances. The Wisconsin habeas corpus pleadings were introduced in the Illinois hearing along with Judge Crabb's order denying Malik the relief he had sought in Wisconsin.

■ Malik relies on *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), seeking specific enforcement of the deportation settlement on the basis of fundamental fairness. The government, Malik argues, did not keep its promises and it should be required to do so. *Santobello*, however, considered the effect of the government failing to keep its part of a plea agreement in a criminal case. We are concerned with the settlement of a civil habeas matter, not a criminal plea bargain with its constitutional implications. In the present case Malik loses, but he lost nothing when he entered into the settlement. The settlement agreement provided that if the agreement turned out to be unworkable then Malik could reopen the matter. In being denied immediate deportation Malik was in the same position as before he filed his petition. The defendant in *Santobello*,

however, in reliance on the plea agreement had withdrawn his plea of not guilty and entered a plea of guilty. Possible government unfairness in fulfilling a plea bargain is distinguishable and does not control the civil issues in this settlement.

■ The government was fully justified in reneging on the settlement agreement. Malik sought by the agreement to escape by deportation back to Pakistan and to avoid the risk of discovery and prosecution of his additional heroin crimes committed from his prison cell. Malik cites *Cooper v. United States*, 594 F.2d 12 (4th Cir.1979). In that case the government made a specific plea bargain proposal. Later it withdrew the proposal when next in contact with defendant's counsel, but that was after the defendant had advised his counsel that he would accept the proposal. The court found constitutional error in the trial court's refusal to enforce the plea proposal. However, the Fourth Circuit recognized that the government's attempted withdrawal of its plea bargain proposal "had nothing to do with extenuating circumstances affecting the government's or any public interest that were unknown when the proposal was extended, but lay simply in a superior's second-guessing of a subordinate's judgment." 594 F.2d at 19.

*Cooper*, a criminal case, is not this case. There are obvious extenuating circumstances affecting both the government's and the public interests. Malik continued his heroin transaction even from inside the federal penitentiary without knowledge of any government authorities. That illegal activity continued until Locke's duplicity was discovered by Malik. The Wisconsin federal authorities first learned of Malik's additional heroin charges just before his parole release and deportation. Malik almost avoided prosecution for his later crimes through the ill-advised, as it turns out, civil settlement providing for his deportation. Malik had bargained for deportation before his later and continuing crimes had been

---

**3.** Before entering into such an agreement the United States Attorney would have been well advised to have contacted the United States At-

torney in the district in which Malik had been originally convicted, but that failure between the two districts to communicate is not fatal.

discovered. The government's and public interests must prevail so that Malik does not escape punishment by way of his expedited deportation scheme. There will be ample time for Malik's deportation, but that will be after he serves this additional sentence.

Malik's motion to dismiss his current indictment on the basis of the deportation settlement was properly denied on the basis of collateral estoppel as he had already litigated the thwarted settlement in Wisconsin and failed. He did not pursue it on appeal. Malik also urges us to strictly apply civil contract law to his deportation settlement agreement. That body of law is likewise not controlling, but if we did apply the ordinary principles of contract law to this factual situation the result would be the same. No matter the theory, the result is the same.

### B.

▇ The second issue is routine. Malik objects to the introduction of his prior baseball heroin similar acts evidence in this cricket ball case. The fact of his actual conviction for those baseball heroin acts, however, was excluded, only the acts themselves being admitted into evidence. Malik tried in advance to foreclose introduction of that prior acts evidence by a motion in limine which Judge Hart properly denied. There was clearly no abuse of discretion. *United States v. Harris*, 761 F.2d 394, 398 (7th Cir.1985).

In each series of Malik's heroin crimes, the mode of operation, plan and design were almost identical and closely related in time. *See United States v. Jones*, 438 F.2d 461, 466 (7th Cir.1971); *United States v. Grzywacz*, 603 F.2d 682 (7th Cir.1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980); *United States v. McCord*, 509 F.2d 891 (7th Cir.), *cert. denied*, 423 U.S. 833, 96 S.Ct. 56, 46 L.Ed.2d 51 (1975). Malik amply demonstrated the opportunity and ability to work his interna-

tional heroin schemes, and the evidence was likewise admissible for those purposes. *United States v. Fairchild*, 526 F.2d 185 (7th Cir.), *cert. denied*, 425 U.S. 942, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976). The prior heroin evidence met all the tests to show knowledge and intent laid down in this circuit in *United States v. Berkwitt*, 619 F.2d 649, 654–55 (7th Cir.1980), which reaffirmed the reasoning of *United States v. Feinberg*, 535 F.2d 1004, 1009 (7th Cir. 1976), *cert. denied*, 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300.

Malik argues, however, that he did not dispute the element of intent and since it was not an issue, the evidence was therefore inadmissible. That question has already been decided against Malik's position. *United States v. Chaimson*, 760 F.2d 798, 805 (7th Cir.1985). The evidence was admissible even in the government's case-in-chief, *United States v. Whetzel*, 589 F.2d 707 (D.C.Cir.1978).

The biggest differences that can be found between Malik's first set of heroin acts and the current set of cricket ball acts is that he used a brother instead of a cousin in Pakistan, and switched the balls from baseball to cricket. Judge Hart carefully admitted only evidence of the prior heroin acts, but not the conviction. Nevertheless, it was plain from the evidence and could not be avoided that Malik was residing in a federal institution when he carried on his latest heroin ventures. At that disclosure, however, the government should have been as chagrined as Malik, maybe more so.[4]

▇ Judge Hart also gave a final instruction limiting the use of the prior heroin acts evidence. None was requested by Malik at the time of admission of the evidence. There was no reversible error in Judge Hart not stating specifically the grounds upon which he was admitting the prior acts evidence. No explanation should have been needed. When little reason can

---

**4.** However, the government hopefully will in the future curtail Malik's conduct of heroin business from his rent-free government quarters

while he awaits a delayed deportation. He may be thinking of using basketballs.

be found or suggested for excluding the evidence, the trial judge does not commit reversible error by failing to make what is apparent more apparent, although it may be the better practice to be specific. There was no error in this instance. *United States v. Price*, 617 F.2d 455, 460 (7th Cir.1979).

### C.

This last issue raises a question about the trial conduct of the Assistant United States Attorney. During breaks in the trial it is conceded that the Assistant United States Attorney had private conversations with the government witness about his testimony before the direct examination of the witness had been completed. In one instance this resulted in a "correction" in the direct testimony of the witness before he became subject to cross-examination. Malik claims that this denied his Sixth Amendment right to counsel and the opportunity to confront witnesses against him. Malik labels that witness, Michael Locke, the government's star witness and he may have been as Locke directly implicated Malik. Locke was an indicted coconspirator who by agreement with the government testified against Malik.

Locke, the government's first witness, testified for three days with the usual lunch and overnight breaks in the trial proceedings. It is not claimed that the Assistant United States Attorney sought any breaks for the particular purpose of coaching the witness. After each of the trial breaks it appears to have been routine for the Assistant United States Attorney to question Locke as to whether in his prior testimony there may have been something that he "forgot," or was "confused about previously." At the opening of the second day of trial the Assistant United States Attorney began by asking Locke whether or not after the day's previous recess he and Locke had had a "brief" discussion. The witness answered "yes," and then explained that it was in regard to whether or not there were things he wanted to testify to, things that he had not mentioned the

day before, and a few other things he had forgotten. His explanation was that he had forgotten some things and had been confused about others. He then proceeded to identify a cousin of Malik's and distinguish this cousin from the brother of Malik who had also received calls in Pakistan. Further, Locke changed the time he had received the heroin from people identified as the "Ellises." The previous day he had testified that he had received the heroin during warm weather, but that the correct time, he now testified, was around February of 1982.

No immediate objection was made by Malik's counsel to these testimonial changes, but the issue was raised shortly thereafter at sidebar when Malik's counsel moved to strike the corrected testimony and further to restrict government counsel from conferring with the witness before his direct examination was completed. The court denied Malik's motion explaining that the rule in that court was that there could be no conversations between a government witness and government counsel during cross-examination, but that it was permitted during direct examination. The court's rule, it was explained, did not apply to the defendant who was permitted to confer with counsel. The Assistant United States Attorney explained at the sidebar that his conversation consisted of no more than an inquiry of the witness, Locke, if there was anything the witness desired to correct from his previous testimony. What Locke may have answered or what follow-up conversation there may have been between the Assistant United States Attorney and Locke at that time does not appear in the record. The Assistant United States Attorney invited cross-examination, not of himself, but of Locke about the conversation.

Malik argues that the change of dates of the heroin delivery to Locke from Ellis was critical, because it would have been impossible for Malik to have participated at the time stated by Locke in his original direct testimony. Malik's argument is premised on what is claimed to be a violation of Fed.R.Evid. 611(c), which restricts the use of leading questions on direct examination,

and also on an alleged violation of Fed.R. Evid. 615, which provides for the exclusion of witnesses. First, Malik argues that he could not effectively cross-examine as he was not present at the recess conversation, and second that the exclusion rule is intended to provide a means of discouraging and exposing fabrication, inaccuracy and collusion. We find those rules have only tangential application to the present situation.

Obviously private conversations between the Assistant United States Attorney and the government witness during the continuing direct examination of a government witness could be subject to abuse. In this case it was revealed by the government that there had been a recess conversation about the testimony which then resulted in changes in the prior testimony. It was therefore possible for Malik to cross-examine the witness in front of the jury about the conversation and the testimony changes. That, however, would not occur if it was not known there had been a private conversation which prompted a change in the testimony. It is possible that cross-examination of the government's witness about what transpired privately between the witness and the Assistant United States Attorney might not always be sufficient. That suggests the undesirable prospect of having to elicit testimony from the Assistant United States Attorney as the other party to the private conversation. It is also conceivable that the cross-examination of the government witness about the private conversation might even prompt the Assistant United States Attorney to want to testify to clarify what actually happened.

█ If no more happened than what appears in this record, the Assistant United States Attorney merely inquiring privately of the witness, Locke, if there was any prior testimony he wanted to correct, that question could have been asked in open court on the record without any private conversation. That inquiry appears to have been the custom of the Assistant United States Attorney whether or not he knew in advance that there was testimony to be corrected. From what this record shows the private conversation was unnecessary and gave rise to this unnecessary issue which casts an unnecessary cloud over the fairness of the government's trial behavior. There are well known and appropriate ways on the record to give a witness on direct examination adequate opportunity to correct testimony without a private corrective conversation during a trial break. Some courts routinely follow the rule of restricting government counsel's conversations with a government witness during trial breaks before the direct testimony is concluded. Other courts are liberal once a request is made in admonishing counsel not to communicate with the witness while the examination continues.

We view it as a matter of the court's sound discretion depending upon the particular circumstances in the case. Careful consideration of the matter by the court and counsel, however, may avoid later unnecessary inquiry as to who said what to whom and why.

In this case there was only one correction of substance and Malik and his counsel and the jury were advised of the conversation and heard the witness make the correction subject to cross-examination by defense counsel. In these circumstances we find no error.

AFFIRMED.