IN THE SUPREME COURT OF THE STATE OF DELAWARE

DAVID BUCKHAM, §
§ No. 538, 2016
Appellant, §
§ Court Below: Superior Court
v. § of the State of Delaware
§
STATE OF DELAWARE, § Cr. ID No. 1509012122A & B
§
Appellee. §

Submitted: January 24, 2018
Decided: April 17, 2018

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED**.

Christina L. Ruggiero, Esquire (*argued*), Eugene J. Maurer, Jr., Esquire, Eugene J. Maurer, Jr., P.A., Wilmington, Delaware, *Counsel for Appellant.*

Abby Adams, Esquire (*argued*), Department of Justice, Georgetown, Delaware, *Counsel for Appellee*.

**TRAYNOR**, Justice:

David Buckham was convicted at trial of assault in the first degree and related charges in connection with a shooting. His appeal presents two questions of criminal procedure. First, we consider the propriety of the trial court's decision to call a recess at the State's request so that one of the State's witnesses, who was in the middle of testifying—and in the middle of recanting a statement he had given to investigators before trial—could consult with his lawyer. Buckham—who was forbidden by the trial court from cross-examining the witness about what transpired during the consultation—contends it was reversible error to allow it and a violation of his confrontation rights to bar him from cross-examining the witness about it.

Second, we consider whether it was plain error for the trial court to uphold a warrant that authorized a search of "[a]ny and all store[d] data" on Buckham's cell phone for any evidence of any kind that might link him to the shooting. The trial court sustained the warrant despite recognizing that the only nexus the warrant application established between his phone and the shooting was that the phone might have contained GPS data that might have been useful to investigators. The search instead turned up some arguably incriminating Facebook messages, and Buckham contends that they should have been suppressed. He did not raise this precise contention below, but he contends that the mismatch between the scope of the warrant and the probable cause the trial court found to support it was so apparent,

2

and that the warrant was so lacking in particularity, that upholding the warrant was plain error.

We agree that the trial court's decision to allow the State's witness a mid-testimony consultation with counsel was reversible error and that the decision to uphold the warrant—and admit the Facebook messages—was plain error. We therefore reverse Buckham's convictions and remand for a new trial.

I
A

During the early morning hours of August 3, 2015, two Wilmington police officers responded to a shooting. They found Gerald Walker—apparently shot in his upper abdomen—lying in a fetal position in the entranceway of a residence. Walker was in pain, but lucid, and he told the officers that he had been shot by the occupants of a dark-colored SUV. He said that three or four shots had come from the front passenger side of the vehicle, but he was unable to see the occupants because the vehicle's windows were heavily tinted. The police did not locate any witnesses or recover any shell casings or other physical evidence from the scene.

With no identification of the perpetrators and no physical evidence, the investigation languished into September. Then, halfway through the month, a 911 caller reported that a person who had previously shot him had just driven past his house. One of the officers who responded was one of the two who had responded to

3

the August 3 shooting, and when he arrived on the scene, he discovered that the 911 caller was none other than Gerald Walker. Walker reported that he and his fiancé were sitting on the steps of her home when the same vehicle from the August 3 shooting drove by. He identified the driver as David Buckham and the passenger as Imean Waters and said that as the two drove by, one or both of the them said, "We're on your top"—meaning that they were still after him.[1] Walker also claimed that Waters waved a gun at him to drive the point home.

The officer also had a brief conversation with Walker about the August 3 shooting. Despite telling the officers on the night of the shooting that he had not been able to get a look at the occupants of the vehicle, Walker now told the officer definitively that Buckham was the assailant. According to the officer's recollection of the conversation, Walker also told him that Buckham had exited the vehicle and fired the shots from there, not while concealed behind the vehicle's tinted windows.

Later that day, a detective interviewed Walker, and Walker again blamed the shooting on Buckham. He told the detective that Waters was driving and that when Waters said "hit him," Buckham started shooting.[2] But while he was steadfast that Buckham was the shooter, he admitted that he did not see the shots being fired or "even see the gun"—he "just heard the shot."[3]

---

[1]     App. to Opening Br. A107.
[2]     App. to Opening Br. A129.
[3]     *Id.*

4

Based on what Walker had told them, law enforcement secured arrest warrants for Waters and Buckham. Waters was arrested that same day, and he too was interviewed by the police. When asked about the shooting on August 3, he admitted that he and Buckham had driven past the site of the shooting, but he initially claimed that he had dropped Buckham off on the side of the road and heard gunshots only after driving away. But after being pressed on his story, Waters told the police that Buckham shot Walker from the passenger seat of his vehicle.

Based on the information provided by Walker and Waters, police secured a warrant for Buckham's arrest. They were unable to locate him, and it was not until approximately six weeks later that he was arrested in a library in New Jersey by federal law enforcement officers. His cell phone was seized incident to his arrest, and it was turned over to the Wilmington police.

The gun used in the shooting has never been recovered. The inability of the police to find the gun or to ascertain where Buckham had been residing during the six weeks they had been searching for him prompted them to seek a search warrant for his cell phone. They apparently thought that they may be able to find GPS location data on the phone, which could reveal where Buckham had been residing and, in turn, might lead to the discovery of the gun.

The warrant they obtained for Buckham's phone authorized them to search not just for GPS location data, but for "[a]ny and all store[d] data contained within

5

the internal memory of the cellular phones [sic]." It is unclear from the record whether the police found any GPS data and, if they did, whether they actually used it to search for the gun. What is clear is that they found and read private messages Buckham had exchanged with various people through the Facebook application on his phone, some of which were later introduced at trial.

## B

Buckham was charged with a host of offenses, the most serious of which was attempted murder in the first degree. Not surprisingly, at center stage at his trial were Walker and Waters, the only percipient witnesses (other than, allegedly, Buckham) to the shooting. Neither wished to be there.

Walker appeared at trial only after being arrested and held on a material-witness warrant. When he was called to the stand, his testimony diverged yet again from the previous accounts he had given to the police. Contrary to his claim that Buckham had shot at him from outside the vehicle, Walker testified that Buckham "started shooting out of the window."[4] The prosecutor sought clarification—asking him, "what window?"—but Walkers reiterated that Buckham shot from through the "passenger side window."[5] And despite telling the detective that he had not seen the weapon that had been used to shoot him or who fired it, Walker testified that he had

[4]     App. A105.
[5]     *Id.*

seen "a little black gun" in Buckham's hand just before the shooting started, and he testified, unequivocally, that Buckham was the shooter.[6] He also disclosed, for the first time, that a "senior citizen" named "Mr. Mel" was sitting outside with him when Waters and Buckham pulled up in the SUV and presumably witnessed the entire encounter. As if these inconsistencies did not provide sufficient fodder to question Walker's credibility, he announced—in open court—that defense counsel's questions were "aggravating" him, that he was "just going to keep answering questions with, 'I don't know'" because he was tired of answering them, and, at one point, that he intended to "plead the Fifth to every question from now on" (which, after the jury was excused, prompted a warning of contempt from the trial judge).[7]

The prosecution then called Waters, whose testimony was more problematic. Before Buckham's trial, Waters had agreed to plead guilty to conspiracy in the second degree (in connection with the allegedly menacing drive-by that occurred in mid-September) in exchange for testifying at Buckham's trial. But despite having admitted on the day of his arrest that Buckham shot Walker from the passenger seat of his vehicle, Waters disavowed even having seen Walker that day:

Q:     So, with respect to the August 3rd, 2015, shooting, what do you
          remember about that day?

A:     The only thing I remember was me and Buckham riding around.
          I didn't see no gun, or nothing.

_____

[6]     App. A108; App. A105 ("Q: So, when you indicated Mr. Waters said "Shoot him," what happened next? A: David Buckham started shooting out the window. I started running.").
[7]     App. A125, A127.

7

. . . .

Q: Do you remember seeing [Walker]—

A: No.[8]

After a brief sidebar conference, the prosecutor attempted to clarify Waters'

testimony:

Q: . . . . So, bringing you back to when you stated that you and Mr. Buckham were driving around on August 3rd, 2015.

A: Yes.

Q: And I asked you did you see [Walker] that day.

A: Yes. I hadn't seen him.

Q: So, is it your testimony today that you did not see [Walker] on August 3rd, 2015?

A: No, I did not.

Q: And, Mr. Waters, on August 3rd, 2015, did you hear gunshots that day?

A: No.[9]

That prompted the prosecutor to request another sidebar conference at which

she told the court, "Mr. Waters is facing significant issues, not only by violating the

cooperation agreement, but also by potentially perjuring himself . . . [and] he may

want to speak to his counsel at this point."[10] Over Buckham's counsel's objection,

the trial judge agreed. Buckham's counsel asked whether he would be permitted to

---

8      App. A152.
9      App. A153.
10     *Id.*

cross-examine Waters about the substance of the conversation, but the trial judge answered in the negative:

> Well, if you are asking whether or not during the break that he [spoke] with counsel, I think I would let you ask that question.
>
> Obviously, exploring with him what counsel maybe told him would be a violation of the attorney/client privilege and I wouldn't allow you to pursue that. But, I would allow you to say, When you took the break did you have an opportunity to speak with [your lawyer?][11]

After the consultation took place, the trial judge reiterated that he would not allow Buckham's counsel "to explore the contents of the discussion because of the privileged situation of that conversation."[12]

Not surprisingly, Waters' testimony took on a different tenor when he returned from speaking with his lawyer. When asked again whether he remembered anything about August 3, the day of the shooting, this time he responded, "Not really."[13] And when asked if he remembered the day Walker was shot, he acknowledged only that he "heard about it."[14] The prosecutor then asked him to confirm that he had told the police on the day of his arrest that he had been present at the shooting, but he denied having any recollection of that either, telling the prosecutor, "I was under the influence. I don't remember."[15] The State then terminated its direct examination so

---

[11]     App. A154.
[12]     App. A155.
[13]     *Id.*
[14]     *Id.*
[15]     *Id.*

9

that it could lay the foundation for admitting the statement Waters gave to police on the day of his arrest in lieu of any further live testimony.

Buckham did not testify. He was ultimately acquitted of attempted murder, but found guilty of the lesser-included offense of first-degree assault and a number of other lesser charges. At a bench trial that followed, he was convicted of possession-of-a-firearm-by-a-person-prohibited and possession-of-ammunition-by-a-person-prohibited charges as a result of the jury's verdict. He was sentenced to twenty-six years of incarceration, suspended after sixteen years.

## II

Buckham contends that the trial judge should not have allowed Waters to confer with his lawyer during his direct examination and made matters worse by restricting Buckham's cross-examination after the consultation took place. He contends that the former was an abuse of discretion and that the latter infringed his right of confrontation, both of which, he says, require reversal.

## A

It is well settled that the trial judge is vested with wide discretion in regulating the conduct of the trial,[16] including "the mode and order of interrogating witnesses

---

[16] *Czech v. State*, 945 A.2d 1088, 1095 (Del. 2008) ("It is well-settled that the trial judge is responsible for the management of the trial and is vested with broad discretion to perform that function."); *Miller v. State*, 224 A.2d 592, 595 (Del. 1966) ("[T]he trial judge has wide discretion in the conduct of the trial.").

and presenting evidence."[17] That includes the "broad power to sequester witnesses before, during, and after their testimony."[18] The "heartland" of witness sequestration concerns whether witnesses should be barred from hearing the testimony of other witnesses before their own[19]—a method of ferreting out false testimony that has "ancient" roots[20]—but the concept also extends to whether a witness should be barred from discussing his testimony with others once questioning has commenced.[21] The concern, of course, is that permitting mid-testimony consultations may lead to "improper attempts to influence the testimony in light of the testimony already given."[22]

Whether and how a witness should be sequestered is a matter committed to the trial judge's discretion. Even "[a] criminal defendant," like Buckham, "has no constitutional right" to any particular type of witness sequestration,[23] and "the failure

---

[17] D.R.E. 611(a).

[18] *Geders v. United States*, 425 U.S. 80, 87 (1976).

[19] *United States v. Sepulveda*, 15 F.3d 1161, 1176 (1st Cir. 1993) (Selya, J.).

[20] John H. Wigmore, *Sequestration of Witnesses*, 14 Harv. L. Rev. 475, 475–79 (1901).

[21] *See Perry v. Leeke*, 488 U.S. 272, 281 (1989) (recognizing that "nondiscussion orders are a corollary of the broader rule that witnesses may be sequestered to lessen the danger that their testimony will be influenced by hearing what other witnesses have to say"); *United States v. Loyd*, 743 F.2d 1555, 1564 (11th Cir. 1984) (characterizing a trial court's decision to "call[] a recess to allow [a] prosecutor to interview [the witness]" as a "suspension of the sequestration rule").

[22] *Geders*, 425 U.S. at 87.

[23] *United States v. Edwards*, 526 F.3d 747, 758 (11th Cir. 2008); *see Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir. 1988) (Posner, J.) ("A refusal to exclude ('separate') witnesses until they testify is not a denial of due process. Separation or sequestration of witnesses . . . is a long-established and well-recognized measure designed to increase the likelihood that testimony will be candid. But the due process clause does not incorporate every refinement of legal procedure designed to make trials fairer or more accurate—not even one hallowed by time.").

to sequester prosecution witnesses does not necessarily violate any constitutional right of the defendant to cross-examine those witnesses, or to a fair trial generally."[24] In Delaware, even a request for a "heartland" sequestration order—an order barring witnesses from hearing the testimony of other witnesses—is not granted as of statutory right, as it is in some jurisdictions.[25] The decision instead rests comfortably in the trial judge's authority to control the mode of witness interrogation. The same is true for a "decision to grant a recess and allow a conference between a lawyer and a testifying witness."[26] The scenarios where a mid-testimony consultation might be requested are too varied for there to be a "hard and fast rule governing every contingency."[27]

But a trial judge must exercise this discretion in service of the trial's truth-seeking function. Trial judges are bound to use their power to control how witnesses

---

[24]     6 Wayne R. LaFave et al., *Criminal Procedure* § 24.4(d), at 528 (4th ed. 2015); *see United States v. Allen*, 542 F.2d 630, 633 (4th Cir. 1976) ("While the sequestering of witnesses is of ancient origin the practice has never been universal . . . . In North Carolina, for example, the invocation of 'the rule on witnesses' was unheard of until very recent years.").

[25]     *See* D.R.E. 615 ("At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses . . . ."); *cf., e.g.*, Fed. R. Evid. 615 ("At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony."); Vt. R. Evid. 615 ("At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses . . . .").

[26]     *People v. Branch*, 634 N.E.2d 966, 968 (N.Y. 1994); *see also Perry*, 488 U.S. at 284 (recognizing, in the context of a defendant-witness, that whether to permit a mid-testimony consultation is "a matter of discretion in individual cases"); *Loyd*, 743 F.2d at 1564 (recognizing, in the context of a prosecution witness, that "[t]he decision whether to [call a recess to] allow a prosecutor to 'work with' a witness is within the discretion of the trial court and will not be reviewed absent an abuse of that discretion").

[27]     *Webb v. State*, 663 A.2d 452, 460 n.9 (Del. 1995) (speaking to the propriety of a mid-cross-examination consultation between a defendant and his lawyer).

are interrogated to "make the interrogation and presentation effective for the ascertainment of truth,"[28] and allowing a witness to consult with counsel in the midst of questioning is fraught with the risk of interfering with the truth-seeking process. As we recognized in the context of a mid-cross-examination consultation—which is not far afield of these circumstances, given how Waters' testimony was going south for the prosecution—allowing a witness who is in the middle of his testimony to consult with his counsel tends to undermine the integrity of the trial process:

> It is antithetical to the process of truth-seeking that any witness be permitted to consult with counsel during cross-examination to be "coached" on what to say, or not say, or how-to-say-it, or how to control or "put a better face on" testimonial damage already done.[29]

Put simply, "the truth-seeking function of a trial will most often be best served by requiring that the witness undergo direct questioning and cross-examination without interruption for counseling."[30] Because of the "tantalizing potential for misconduct" they pose,[31] mid-testimony conferences are "an extremely dangerous practice."[32] No trial judge should allow one without carefully considering whether there is a genuine need for it—one that rises above a bare desire to coach a struggling

---

[28] D.R.E. 611(a)(1).
[29] *Webb*, 663 A.2d at 459.
[30] *Branch*, 634 N.E. 2d at 967.
[31] *People v. Pendleton*, 394 N.E.2d 496, 507 (Ill. App. Ct. 1979).
[32] *Duke v. United States*, 255 F.2d 721, 728 (9th Cir. 1958).

witness—and, even if there is, whether the risk of coaching is simply too great to allow it.[33]

B

The decision to allow this conference suffered from a number of problems. The justification for it was that Waters' testimony, which flatly contradicted the statement he had given to the police, may have put him at risk of perjury or a breach of his plea agreement and that he should have a chance to discuss those risks with his counsel before going any further. But the request for the conference did not come from Waters or even from his own lawyer, who was present in the courtroom. The request came from the prosecutor, just as Waters' testimony started going sideways.[34] There is naturally a greater risk that a mid-testimony conference will be used for coaching when the request comes in the midst of damaging testimony—and comes from the advocate whose case it is damaging.

---

[33]  *See Geders*, 425 U.S. at 90 ("[T]he trial judge, if he doubts that defense counsel will observe the ethical limits on guiding witnesses, may direct that the examination of the witness continue without interruption until completed. If the judge considers the risk high he may arrange the sequence of testimony so that direct- and cross-examination of a witness will be completed without interruption.").

[34]  That neither Waters nor his counsel saw fit to request a recess distinguishes these circumstances from those where a witness (or the witness's lawyer) seeks a recess for the purpose of discussing whether to assert a privilege. *Cf.* Del. Super. Ct. Civ. R. P. 30(d)(1) (providing, in the context of civil depositions, that "[f]rom the commencement until the conclusion of a deposition, . . . the attorney(s) for the deponent shall not . . . consult or confer with the deponent regarding the substance of the testimony already given or anticipated to be given *except for the purpose of conferring on whether to assert a privilege against testifying* or on how to comply with a court order" (emphasis added)).

14

These features set this case apart from those where courts have permitted time-outs in the middle of testimony for more benign reasons, like *United States v. Loyd*,[35] where a prosecutor—who had met a witness for the first time only thirty minutes before trial because the witness was under federal protection—quickly realized that he had not had enough time to speak with the witness to properly tailor his examination and was granted a recess to have a chance for a more thorough interview, or *Frierson v. State*,[36] where the court granted a prosecutor's request for a recess during the direct examination of a rape victim so that the prosecutor could help her regain her composure. In this case, the very purpose of the recess was to allow Waters to discuss with his lawyer the testimony already given and to consider whether he should stick by it. As the trial judge put it, he was granting the recess to "have counsel speak with him, just to make sure that they are all on the same page."[37]

Compounding these problems was the trial court's decision to seal the conversation off from cross-examination. Through many of the cases where mid-testimony consultations were sustained runs a common thread: the opposing side was permitted a full opportunity to inquire into what transpired during the

---

[35] 743 F.2d 1555 (11th Cir. 1984).
[36] 543 N.E.2d 669, 673 (Ind. Ct. App. 1989).
[37] App. A154.

15

consultation.[38] "Skillful cross-examination" can expose a coached witness,[39] and if a court is convinced that there is a legitimate need for a mid-testimony consultation, making the consultation fair-game for inquiry lowers the danger that it will corrupt the proceedings. Worse still, the trial court informed the parties that the consultation would be off-limits for cross-examination before it took place. In many of those cases where consultations have been upheld, the trial judges warned the parties in advance that whatever transpired would be fair-game for inquiry, which can be an effective prophylaxis against coaching. But here, if the temptation to coach Waters was brewing, the trial court's advance ruling telegraphed that there would be no chance for Buckham's counsel to uncover it.

But not all of the circumstances cut against the trial court's decision. The fact that the lawyer the court was granting Waters a chance to confer with was his own— and not the prosecutor—reduced the risk that the recess would provide the State with an opportunity coach him on his testimony.[40] And the justification the prosecutor

---

[38]    *See, e.g.*, *United States v. Malik*, 800 F.2d 143, 148 (7th Cir. 1986) ("The Assistant United States Attorney invited cross-examination . . . of [the witness] about the conversation."); *Loyd*, 743 F.2d at 1564 ("[D]efense counsel had ample opportunity to cross-examine [the witness] about the interview by the prosecutor, yet no counsel was able to establish that [he] was coached."); *Branch*, 634 N.E.2d at 968 ("[T]he court allowed the defense the opportunity to cross-examine the witness about the conference and about the change in testimony."); *Frierson*, 543 N.E.2d at 673 ("[D]efense counsel had the opportunity on cross-examination to explore any unfair coaching he suspected took place during the brief recess.").

[39]    *Geders*, 425 U.S. at 89–90.

[40]    *Cf*. 6 John Henry Wigmore, *Evidence in Trials at Common Law* § 1841, at 472 (James H. Chadbourn rev., 1976) (proposing that trial courts should not allow private discussions between a witness and "an attorney *in the cause*" (emphasis added)).

offered for the recess—that Waters' testimony could be exposing him to criminal prosecution—was not so unfounded as to be nothing more than a pretext to get him off the stand and into a coaching session. Waters had represented as part of his plea deal that the statement he had given to investigators prior to trial was true, so if he had remained steadfast in his repudiation of that statement as he had started to do before the prosecutor asked for a recess, he risked breaching his cooperation agreement and exposing himself to further criminal prosecution for the shooting.[41] Reversing course and standing by his earlier statement would not have been a risk-free proposition either. If the statement he had given to investigators had been false, reaffirming that statement on the stand would be perjury. The risks Waters faced were varied enough—and real enough—to give credence to the prosecutor's suggestion to let him discuss these scenarios with his lawyer before going any further.

Aside from concerns about Waters, we have recognized that a lawyer who realizes her client is about to commit perjury has an ethical obligation to try to dissuade her client, and we have suggested that if it happens while the client is on the stand, she may be justified in making a "forthright application to the court for a

---

[41]     By the time of Buckham's trial, Waters had already been sentenced on the charge he agreed to accept under his plea agreement, but that charge—second-degree conspiracy—related only to the mid-September drive-by, not to the August 3 shooting, and his written plea agreement made no promises that the State would spare him from liability for the shooting. So disavowing his earlier statement to investigators risked leading the State to respond to his breach of the cooperation agreement by deciding to charge him in connection with the shooting.

special ruling permitting limited consultation," and the court may be justified in granting it.[42] Waters, of course, was not the prosecutor's client, but the ethical obligation to prevent a fraud on the court applies with no less force to any other witness that a lawyer calls.[43]

Whatever the merits of allowing the conference, there is no question that it cast a "cloud over the fairness of the government's trial behavior,"[44] which illustrates why granting a private, mid-testimony conference treads on treacherous ground. But we need not resolve whether that decision was an abuse of the trial court's discretion, because after initially defending the decision, the State conceded at oral argument that it was error.[45]

Assuming, then, that the conference should not have occurred, we turn to whether the fact that it did occur caused Buckham harm sufficient to require reversal.

---

[42]    *Webb*, 663 A.2d at 460 n.9.

[43]    *See* Del. R. Prof. Conduct 3.3 cmt. 10 ("[A] lawyer may be surprised when the lawyer's client, or another witness called by the lawyer, offers testimony the lawyer knows to be false, either during the lawyer's direct examination or in response to cross examination by the opposing lawyer. In such situations . . . , the lawyer must take reasonable remedial measures. In such situations, the advocate's proper course is to remonstrate with the client confidentially, advise the client of the lawyer's duty of candor to the tribunal and seek the client's cooperation with respect to the withdrawal or correction of the false statements or evidence.").

[44]    *Malik*, 800 F.2d at 149.

[45]    Oral Argument at 39:13 (Jan. 24, 2018), http://livestream.com/accounts/5969852/events/ 8024893/videos/169188865 (Justice Traynor: "Does the State concede that it was abuse of discretion to allow the recess for the communication?" A: ". . . . The State would concede that it was an error for the judge to allow this to happen. . . . It's difficult to concede an error like that by the trial judge when it was the prosecutor who brought the issue up and created the situation, but the State would concede that it was an error.").

The State maintains that the error was harmless and does not require a new trial. We disagree.

The State contends that the conference could not have prejudiced Buckham because Waters' testimony did not materially change after he conferred with his lawyer. But the record shows otherwise. Before the recess, Waters' testimony about the day of the shooting was unequivocal. He testified that he spent the day driving around with Buckham, did not see Walker at any time that day, and had not heard any gunshots—testimony that all favored Buckham and directly contradicted the statement Waters had given to investigators on the day of his arrest. After the recess, the first question the prosecutor asked Waters was whether he remembered the day of the shooting, and this time, he responded, "Not really."[46] A few questions later, when he was asked whether he remembered telling the police on the day of his arrest that he saw Buckham shoot Walker, Waters said—apparently for the first time—that he "was under the influence" when he gave that statement and could not remember what he said.[47]

In the State's view, even if that did amount to a change—and we think there is no question that it did—it was harmless because when Waters was cross-examined, he reverted back to the testimony he had been giving before the recess.

---

[46]    App. A155.
[47]    *Id.*

He told Buckham's counsel that he did, in fact, remember the day of the shooting and was not present when Walker was shot. He also testified that the statement he gave to police on the day of his arrest—which, apparently, he did remember making—was a lie, told to secure himself a favorable plea deal. As the State sees it, any change in his testimony after the recess had no impact on the case because by the end of cross-examination, his testimony was back to where it started.

But this line of reasoning does not give due regard to the effect that changes in a witness's story have on the witness's credibility. Had the recess not happened, the jury would have had to weigh two competing versions of events: the statement Waters gave to police on the day of his arrest (pinning the shooting on Buckham) and Waters' claim on the stand—while under oath—that the statement had been a lie, made to shift the blame to Buckham. But the recess seems to have been responsible for injecting a third version of events into Waters' testimony: his claim that he had no memory of the day of the shooting and had been under the influence on the day that he spoke with the police. Waters would later abandon that new story, but the bell had been rung; the more stories a witness tells, the less believable any of them become. Rather than being presented with a witness who had a conceivable motive and explanation for fabricating a statement that pointed the finger at Buckham, the jury now had on their hands a witness who could not seem to keep his story straight, which may have led the jury to give greater weight to the statement

he gave to police than to what he was saying on the stand or to simply disregard his trial testimony altogether.

Not all errors call for reversal.[48] But to deem an error harmless—and safely disregard it—we must have a "fair assurance . . . that the judgment was not substantially swayed by the error."[49] That is necessarily a case-specific inquiry; one that requires us to "scrutinize[] the record" to evaluate "both the importance of the error and the strength of the other evidence presented at trial."[50]

The importance of Waters' testimony is self-evident, especially in light of the wobbly testimony from Walker that immediately preceded it. Walker was the only other eyewitness, and his account of the events had varied ever since the night of the shooting. And then there's the matter of "Mr. Mel," whose presence at the scene of the crime Walker did not disclose until trial, to the surprise of both sides. In a word, Walker's testimony was problematic.

---

[48] *See* Del. Super. Ct. Crim. R. P. 52(a) (providing that harmless errors—that is, "[a]ny error, defect, irregularity or variance which does not affect substantial rights"—"shall be disregarded").

[49] *Ashley v. State*, 798 A.2d 1019, 1023 n.17 (Del. 2002) (per curiam) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). As we have explained, no party—not even a criminal defendant—has a constitutional right to any particular type of witness sequestration, so even if a trial court abuses its discretion by allowing a witness to consult with a lawyer in the middle of testimony, that error is not of constitutional magnitude and is not subject to the more rigorous form of harmless error review that applies to trial errors that infringe upon constitutional rights. *See Capano v. State*, 781 A.2d 556, 597 n.54 (Del. 2001) (recognizing the distinction between constitutional and non-constitutional errors and explaining that when a trial court makes an error "of a constitutional magnitude, the conviction[] may be sustained [only] if the error is 'harmless beyond a reasonable doubt'").

[50] *Van Arsdall v. State*, 524 A.2d 3, 10–11 (Del. 1987).

In addition, there was no physical evidence linking Buckham to the shooting. No gun or shell casings were recovered. And leaving aside the arguably incriminating Facebook messages, which we will discuss in more detail in connection with the propriety of the State's search of Buckham's phone, Buckham did not make any incriminating admissions. On this record, it would be a stretch to say that evidence of Buckham's guilt was overwhelming.

So Waters' testimony—and the statement he had given to police pinning the shooting on Buckham—were of substantial importance. If the jury were to credit that statement, that would be powerful evidence that would corroborate Walker's (latest) story. But if the jury were to credit Waters' claim—under oath—that he falsified the statement to keep himself out of jail, that would do significant damage to a case that was not particularly robust. How Waters came across on the stand was a significant moment in the trial, but just as Waters' testimony was tilting toward Buckham, the trial court granted a recess. When Waters retook the stand, he brought with him a third version of events—one of memory lapse and intoxication—which he would later disavow on cross-examination.

Whether the jury would have looked at Waters' testimony differently had he not, after speaking with his lawyer, injected that third story into the mix, and whether that would have changed the outcome, we cannot say for sure. But nor can we say "with fair assurance," on the record of this case, "that the effect . . . was slight, if any

at all, and had no substantial influence upon the jury."[51] For that reason, the decision to allow the mid-testimony conference was reversible error.

C

Buckham also contends that allowing Waters to confer with his lawyer during his testimony and then sealing that conversation off from inquiry violated his confrontation rights under the United States and Delaware constitutions. The trial court held that the attorney-client privilege barred Buckham's counsel from cross-examining Waters about the conversation, and that, Buckham contends, allowed the privilege to trump his constitutional right of confrontation in violation of both the Confrontation Clause of the Sixth Amendment and the corresponding protection in Article I, Section 7 of the Delaware Constitution.

Whether the attorney-client privilege must give way to the defendant's right of confrontation has generated debate[52] and remains an open question at the United

---

[51]     *Hutchins v. State*, 153 A.2d 204, 208 (Del. 1959).

[52]     *See, e.g.*, *Murdoch v. Castro*, 609 F.3d 983, 993–95 (9th Cir. 2010) (en banc) (plurality opinion) ("[N]o Supreme Court case has directly addressed the potential conflict between state-law attorney-client privilege and the Confrontation Clause . . . . The Supreme Court might well decide that it is worthy of greater protection than the marital privilege or the confidentiality of juvenile delinquency proceedings." (citations omitted)); *id.* at 1004 (Kozinki, J., dissenting) ("Even if the attorney-client privilege were of the same dignity as the Fifth Amendment, the need for 'cross-examination and impeachment' would overcome it."); *see generally* 24 Charles Alan Wright and Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5506, at 566 (1st ed. 1986) (suggesting that "the attorney-client privilege. . . may have to yield when it comes in conflict with the constitutional right of a criminal defendant," but that while [t]his possibility is acknowledged in the cases, . . . it is not a frequent occurrence," and collecting cases).

23

States Supreme Court.[53] For a trial judge who agrees to allow a prosecution witness to speak with his lawyer in the middle of testimony, the conflict between the witness's right to invoke the privilege and the defendant's right to confront him gives rise to a difficult trilemma: allow the cross-examination to proceed (letting the defendant's right of confrontation trump the attorney-client privilege); uphold the privilege and strike the testimony the witness has already given (thereby protecting both the privilege and the right of confrontation, at the expense of the evidentiary value of the witness's testimony); or, as the trial court did here, sustain the privilege-based objection, but allow the witness's prior testimony to stand (risking a violation of the defendant's right of confrontation).[54]

Because we conclude that the decision to allow the consultation to take place was reversible error, we need not take up the questions that Buckham's argument presents or determine whether the path the trial court chose in this case violated Buckham's right of confrontation.

III

To bolster the case against Buckham, the State introduced a series of Facebook messages he sent after the warrant had issued for his arrest. In one exchange,

---

[53] *See Swidler & Berlin v. United States*, 524 U.S. 399, 408 n.3 (1998) ("Petitioners, while opposing wholesale abrogation of the privilege in criminal cases, concede that exceptional circumstances implicating a criminal defendant's constitutional rights might warrant breaching the privilege. We do not, however, need to reach this issue, since such exceptional circumstances clearly are not presented here.").

[54] *See Murdoch*, 609 F.3d at 1005 (Kozinski, J., dissenting) (discussing these alternatives).

Buckham said, "people told on me"; in another, he said, "I'm hot," and when asked whether he needed to "cool down," Buckham said, "It's too late. I'm just gonna wait on them to come."[55] There were a few more to similar effect.

The police found them after executing the search warrant they obtained for Buckham's phone. The warrant authorized them to search the phone for "[a]ny and all store[d] data contained within the internal memory of the cellular phones [sic], including but not limited to, incoming/outgoing calls, missed calls, contact history, images, photographs and SMS (text) messages" for evidence of "Attempted Murder 1st Degree."

Buckham claims that the search warrant was flawed in two respects. First, he contends that the application and affidavit upon which the warrant was based did not establish probable cause to search his phone because it did not allege a sufficient nexus between the crime he was suspected of committing and his cell phone. Second, he asserts that the warrant was so overbroad and so lacking in specificity that it constitutes an unlawful "general" warrant. Buckham raised his first argument in an unsuccessful pretrial suppression motion; he raises the second argument for the first time on appeal.

The State responds that the warrant application provided numerous facts connecting Buckham's phone to the crime, the strongest of which being that the GPS

---

[55]     App. A192, A194.

data on the phone may have been able to shed light on where Buckham had been during the six weeks he was at-large, which in turn might lead police to the gun used in the shooting. The application also mentioned that the phone was found on him when he was arrested, that police were aware that he had been posting on social media about the possibility of being arrested while he was at-large, and that criminals often use cell phones to talk about their criminal activity.

## A

We apply the "substantial basis" test to Buckham's contention that the affidavit did not supply probable cause to believe that evidence of the crime he was suspected of committing would be found on his phone.[56] Because we pay "great deference" to the issuing magistrate's determination that the warrant was supported by probable cause,[57] "our duty is simply to ensure that the magistrate had a substantial basis for concluding that probable caused existed"[58] and that the magistrate's determination did not "reflect[] an improper analysis of the totality of the circumstances."[59]

---

[56]    *See Sisson v. State*, 903 A.2d 288, 296 (Del. 2006).
[57]    *Jensen v. State*, 482 A.2d 105, 111 (Del. 1984).
[58]    *Sisson*, 903 A.2d at 296.
[59]    *LeGrande v. State*, 947 A.2d 1103, 1108 (Del. 2008) (quoting *United States v. Leon*, 468 U.S. 897, 915 (1984)).

26

As for Buckham's challenge to the warrant's particularity and breadth, we review those questions *de novo*.[60] But because he did not raise this challenge in the Superior Court, we will take notice of an error only if it is plain.[61] Under that standard, "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[62]

B

The Fourth Amendment to the United States Constitution and Article I, Section 6 of the Delaware Constitution provide that warrants must be supported by a showing of probable cause. For a search warrant to issue, there must be more than just probable cause that a crime has been committed; there must also be, "within the four corners of the affidavit, . . . facts adequate for a judicial officer to form a reasonable belief that . . . the property to be seized will be found in a particular place."[63] The constitutional requirement that there be a nexus between the crime and the place to be searched is also enshrined in Delaware law, which requires the

---

[60]    *See Wheeler v. State*, 135 A.3d 282, 295, 302 (Del. 2016) (confronting a claim that search warrants for electronic devices were "in the nature of a general warrant, unconstitutionally overbroad, and lack[ed] sufficient particularity").

[61]    After conceding in his opening brief and at oral argument before a three-Justice panel of this Court that he had not raised this claim below, Buckham argued to the Court *en Banc* that he had. Although his counsel made a passing reference during the suppression hearing to the concept of general warrants and to our recent decision in *Wheeler v. State*, 135 A.3d 282 (Del. 2016), which addressed the problem of overbroad and insufficiently particular electronic-device warrants, his motion did not mention this issue, and the trial court did not rule on it. We are unpersuaded by Buckham's belated effort to secure a more favorable standard of review.

[62]    *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

[63]    *Sisson*, 903 A.2d at 296.

warrant application to not only "describe the things . . . sought as particularly as may be," but also to "state that . . . such things are concealed in the house, place, conveyance or person designated and . . . recite the facts upon which such suspicion is founded."[64]

Buckham contends that the affidavit in this case did not provide a substantial basis for the issuing magistrate to find probable cause to believe that the phone would contain any fruits, instrumentalities, or evidence of the shooting. He stresses that there was no evidence that a cell phone was used as an instrumentality of the crime or that Walker and Buckham were known to communicate by phone.

Buckham is right that many of the allegations in the warrant application are too vague and too general to connect his cell phone to the shooting. Particularly unpersuasive was the statement that "criminals often communicate through cellular phones"[65] (who doesn't in this day and age?) and the statement that Waters' girlfriend—who owns the vehicle that Waters was allegedly driving on the day of the shooting—"contacted Buckham's girlfriend via cell phone" before she spoke with the police about the incident,[66] which provides no basis at all to suspect that *Buckham's* cell phone was likely to contain evidence. Nor do we see much significance in the statement that "Buckham was making posts on social media about

---

[64]     11 *Del. C.* § 2306.
[65]     App. A34.
[66]     App. A33.

28

getting arrested" while he was at-large.[67] By that time, an arrest warrant had been issued for him; the fact that Buckham may have been using his phone to talk about his impending arrest connects his phone to the arrest warrant, not the underlying crime. Even with the deference we owe to a magistrate's probable cause finding, these sorts of generalized suspicions do not provide a substantial basis to support a probable cause finding.

The affidavit seems to have left a similar impression on the trial court. The court expressed skepticism both about its generalized allegations of a nexus between cell phones and criminal activity[68] and about the inferences that could be drawn from Buckham's social media activity.[69] But the court was moved by one inferential chain in the affidavit: that GPS data from his phone might help the police determine where he had been while he was at-large and, perhaps, lead them to the gun or other evidence of the crime. That, in the court's view, created at least some nexus between the phone and the crime:

> [T]he defendant had his—potentially had his phone at the location at which he was residing and had fled to in New Jersey, and [that] potentially would have . . . been sufficient probable cause to allow them to see whether or not the phone would then provide them the location

---

[67]    App. A34.

[68]    *See* App. A76–77 ("[I]f all I had was I know about cell phones, and cell phones can do this, I [would] have real concerns about that being an adequate warrant.").

[69]    *See* App. A76 (commenting that while the affidavit alleged that Buckham had done "some posting," "I think the defense has done a good job of persuading me that perhaps that's not as significant as I initially thought it was").

of where he was staying, which potentially would lead them to evidence concerning the crime.[70]

So despite the court's view that the affidavit did only "a minimal amount of work to try to justify the warrant" and "[s]urely" could have been better,[71] the affidavit's suggestion that a search of the phone could uncover GPS data that could lead the police to further evidence was enough to uphold the magistrate's determination that there was probable cause to search. And on that basis, the court upheld the warrant. But the court failed to address the fact that the warrant it upheld was plainly mismatched to the probable cause it cited to justify it. To be fair, neither did Buckham, but the scope of the warrant so far outruns that probable cause finding—and is so lacking in particularity relative to that probable cause finding— that it qualifies as plain error.

C

We recently had the opportunity to discuss the problem of overbroad and insufficiently particular warrants issued to search electronic devices. In *Wheeler v. State*, we recognized that a warrant—no matter its target—must both "describe the things to be searched with sufficient particularity and be no broader than the probable cause on which it is based."[72] Those requirements serve to achieve the twin

---

[70] *Id.*
[71] App. A77–78.
[72] *Wheeler v. State*, 135 A.3d 282, 299 (Del. 2016).

objectives of the warrant requirement: ensuring that "those searches deemed necessary [are] as limited as possible" and eliminating "exploratory rummaging in a person's belongings."[73] But we also recognized that warrants issued to search electronic devices call for particular sensitivity given the "enormous potential for privacy violations" that "unconstrained searches of cell phones" pose.[74] Modern smartphones store an "unprecedented volume of private information,"[75] and a top-to-bottom search of one can "permit the government access to 'far more than the most exhaustive search of a house.'"[76]

In this case, a top-to-bottom search was precisely what the warrant authorized. The police were granted the authority to search "[a]ny and all store[d] data contained within the internal memory" of the phone for evidence of the shooting. Buckham believes that makes this warrant a "general warrant"—that scourge of executive overreach "abhorred by the colonists" that permitted "a general, exploratory

---

[73]    *Id. at* 298 (alteration in original) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).

[74]    *Id.* at 299 (citing *Riley v. California*, 134 S. Ct. 2473 (2014)); *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) ("The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important."); 2 Wayne R. LaFave, *Search and Seizure* § 4.6(a), at 774 (5th ed. 2012 & Supp. 2017) ("The greatest care in [drafting a warrant's] description is required when the consequences of seizure of innocent articles by mistake is most substantial, as . . . where the place to be searched is a cell phone . . . .").

[75]    *Id.*

[76]    *Id.* (quoting *Riley*, 134 S. Ct. at 2491).

rummaging in a person's belongings"[77] for vaguely-defined categories of contraband like "smuggled goods" or "obscene materials."[78]

But whether or not the warrant resembles a founding-era general warrant, Buckham is correct that it does not pass muster. As we said in *Wheeler*, a warrant must "describe the items to be searched for and seized with as much particularity as the circumstances reasonably allow" and be "no broader than the probable cause on which it is based."[79] This warrant fails both requirements.

The trial court concluded that the affidavit created probable cause to search the phone for GPS data to ascertain where Buckham had been during the six weeks prior to his arrest,[80] but the warrant did not limit the search of Buckham's cell phone to any relevant time frame and authorized the search of any data on the phone. Worse still, it authorized law enforcement to search categories of data that had nothing to do with GPS location information, like "incoming/outgoing calls, missed calls, contact history, images, photographs and SMS (text) messages."[81] So this warrant

---

[77]      *Id.* at 296 (quoting *Coolidge*, 403 U.S. at 467).
[78]      *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002) (Alito, J.).
[79]      135 A.3d at 299, 305.
[80]      We express no opinion on the correctness of that conclusion or, more generally, the notion that a warrant to search a cell phone for GPS data can issue upon a showing that law enforcement cannot account for a suspect's whereabouts prior to an arrest and believe that the GPS data may lead them to another place to search for evidence. We conclude simply that the warrant was plainly too broad and too lacking in particulars to be supported by the trial court's probable-cause determination.
[81]      App. A31. We are aware that modern smartphones can tag photographs with GPS-based location information, but that would at most justify an examination of the metadata of any photographs retrieved from the phone to see whether it contained location information.

was both vague about the information sought—despite the fact that a far more particularized description could have been provided—and expressly authorized the search of materials there was no probable cause to search, like the contents of all of the Facebook messages Buckham sent. For both of those reasons, the warrant is invalid, and the search for and review of the messages violated Buckham's rights under the United States and Delaware constitutions.

D

Because Buckham did not fairly raise this issue below, our inquiry is not over. We must next determine whether allowing this warrant to stand was plain error.

Plain errors must be "apparent on the face of the record[,] . . . basic, serious and fundamental in their character, and . . . clearly deprive an accused of a substantial right, or . . . clearly show manifest injustice."[82] There is no question that the flaws in the warrant are readily apparent. Once the trial court determined that the nexus between the phone and the shooting hinged on the potential for uncovering GPS data about Buckham's location, that rendered the scope of the warrant far too broad and far too vague to be propped up by that probable cause finding.

We recognize that we decided *Wheeler* only a month before the trial court ruled on Buckham's suppression motion, but we judge whether an error is apparent

---

[82] *Wainwright*, 504 A.2d at 1100.

"from the vantage point of the appellate court in reviewing the trial record, not whether it was apparent to the trial court in light of then-existing law."[83]

But to be plain error, the error must be more than just apparent from the record; it must also be "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[84] This means that "it must have affected the outcome of the trial."[85] That requires us to consider the significance of the error—in this case, of admitting the Facebook messages that law enforcement read while searching Buckham's phone—in light of the record as a whole.[86]

As we have observed, the prosecution's case against Buckham was not iron-clad. Walker's version of events varied from not being able to identify his mystery assailants to describing in detail a gun he claimed to have seen in Buckham's hand before the shooting started. And Waters' testimony, for its part, varied from claiming that he lied when he pointed the finger at Buckham to secure himself a plea deal, to claiming to have forgotten both the day of the shooting and his statement to police, to going back to calling it a lie. Not surprisingly, then, the prosecutor told the jury that "what [the police] found out from the cell phone that was seized from David Buckham's person" would be "so important" to their decision.[87]

---

[83]    *Capano*, 781 A.2d at 663.
[84]    *Williams v. State*, 796 A.2d 1281, 1284 (Del. 2002).
[85]    *Morgan v. State*, 962 A.2d 248, 254 (Del. 2008).
[86]    *See Wainwright*, 504 A.2d at 1100–01.
[87]    App. A77–78.

34

The mismatch between the scope of the warrant and the probable cause finding that the trial court cited to support it is readily apparent from the record, and this error led to the admission of evidence that even the State conceded was important to the trial. We conclude under these circumstances that upholding the warrant and admitting the Facebook messages that the State uncovered was plain error.[88]

IV

We reverse Buckham's convictions and remand for a new trial.[89]

---

[88] *See Henry v. State*, 373 A.2d 575, 576 n.1 (Del. 1977) ("We regard the failure to comply with the [night-time warrant] statute as plain error . . . .").

[89] Before this Court, Buckham also argued that the trial court abused its discretion in denying his request for a mistrial after the lead detective mentioned his nickname, which the parties and the trial court agreed before trial was not to be used because of its possible prejudicial effect. We need not reach the substance of Buckham's argument on this issue because of our decision to reverse and remand, but we assume that on retrial the improper mention of Buckham's nickname will not recur.