**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

STATE OF DELAWARE     )
    )
    )     Def. I.D. # 2211013293
v.     )
    )
    )
ANDREW RILEY,     )
    )
    Defendant.     )

Submitted: May 6, 2024
Decided: May 22, 2024

*Three Motions to Suppress Evidence from Search Warrants*

**DENIED**

## MEMORANDUM OPINION AND ORDER

Rebecca E. Anderson, Esquire and Casey L. Ewart, Esquire, Deputy Attorneys General, Department of Justice, 13 The Circle, Georgetown, DE 19947; Attorneys for State of Delaware.

James Murray, Esquire and Melissa Lofland, Esquire, Assistant Public Defenders, Office of the Public Defender, 14 The Circle, 2nd Floor, Georgetown, DE 19947; Attorneys for Defendant Andrew Riley.

**KARSNITZ, R. J.**

# INTRODUCTION

Smart phones have many uses which center on communication and storage of information. Police agencies' intrusions on communications and information stored on smart phones raise novel and thorny issues under both the United States and Delaware Constitutions. We have come a long way from protecting the security of our homes to protecting the security of our electronically stored information ("ESI"). Over the past score of years, the courts of this country have struggled to deal with access to ESI, and the increasingly sophisticated devices which hold it.

Delaware is no different. Our Supreme Court has addressed ESI in the constitutional context in a series of cases, *Wheeler v. State*[1], *Buckham v. State*[2], *Taylor v. State*[3], *Thomas v. State*[4], and *Terreros v. State.*[5] My synthesis of these cases is that to meet constitutional standards, search warrants (and their accompanying affidavits of probable cause) for the search of smart phones must contain the following:

1. Statements about the particular categories of data or information to be searched;

---

[1] 135 A.3d 282 (Del. 2016).
[2] 185 A.3d 1 (Del. 2018).
[3] 260 A.3d 602 (Del. 2021).
[4] 305 A.3d 683 (Del. 2023).
[5] 2024 WL 193104 (Del. Jan. 18, 2024).

2. Statements establishing probable cause for the various categories of data or information being sought; and

3. A temporal limit on the scope of the search.[6]

What must be avoided is an exploratory rummaging through a person's electronic data. I am to look for time limitations (or the lack thereof), disfavored phrases like "any and all," or the failure to provide a nexus between the material sought and the probable cause provided. Under longstanding law, I examine the affidavit of probable cause for the necessary information in an overriding effort to determine if probable cause exists to show that a crime has been committed, and probable cause that evidence of that crime can be found in the place to be searched.

With these principles in mind, I address three of the four motions made by Andrew Riley ("Defendant") to suppress evidence found in the ESI on his cell phone, which was searched by police.[7] I also tangentially address a fifth motion to suppress a statement made by Riley to police detectives,[8] because in my mind the police conduct in taking Defendant's statement has bearing on the overall police conduct.

---

[6] *Buckham*, 185 A.3d at 19.

[7] In a suppression hearing held on May 6, 2024, I denied one of Defendant's motions, a motion to suppress his thumb print taken pursuant to a search warrant, from the bench, for the reasons stated on the record of that hearing.

[8] I also denied this fifth motion from the bench during the May 6, 2024 suppression hearing, for the reasons stated on the record of that hearing.

## FACTS

On the afternoon of February 5, 2020, a friend found the body of the victim, Rachel Brandner, stuffed inside a utility closet at her home in Laurel, Delaware. Someone had placed a trash can and vacuum on top of her body. Police quickly identified that a red pickup truck owned by the victim was missing. Police issued a general broadcast for the truck so all police agencies would be aware that the Delaware State Police believed the truck was connected to a homicide.

On February 7, members of the Milford Police Department performed a traffic stop of the victim's truck. At the time of the stop, Rachel Casas was operating the truck, and Defendant was a passenger. Milford Police transported Casas and Defendant to Delaware State Police Troop 3 and transported the truck to Delaware State Police Troop 5.

## DEFENDANT'S STATEMENT TO POLICE

Delaware State Police Detectives Stephen Yeich and Mark Csapo interviewed Defendant. I pause in my discussion of the search warrants to discuss the audio and video tape recorded interview. It was the subject of Defendant's motion to suppress his statement. The argument made by Defendant was that, although the Detectives read Defendant his *Miranda* warnings, when he was asked if he waived those rights, his answer was inaudible. Thus, there was no affirmative waiver on the record. At

4

the suppression hearing I held on May 6, 2024, to address Defendant's motions, the parties conceded Defendant's answer was inaudible. I watched and listened to the recording, and Defendant's answer to this important question was in fact inaudible.

What happened next was both interesting and telling. Detective Yeich began the interview with a few preliminary questions. Less than two minutes into the interview, it was interrupted by officers who were apparently watching the interview from outside the interview room. According to Detective Yeich's testimony at the suppression hearing, a superior officer told him Defendant's statement waiving his *Miranda* rights was inaudible and instructed him to go through the process again. Detective Yeich did so, and this time Defendant's answer agreeing to speak to the police was loud and clear.

In addition, Detective Yeich testified that he had heard the initial response, and it was affirmative. His conduct in the first few minutes of questioning supports this testimony. Finally, after about fifty minutes of discussion with Defendant, police broached the topic of the victim's death. Defendant refused to answer any further questions and invoked his right to counsel. The Detectives clarified Defendant's intent, and then terminated questioning.

Based on all the foregoing, at the suppression hearing on May 6, 2024 I denied Defendant's motion to suppress his statement for reasons I expressed on the record.

In my opinion, the State Police detectives behaved professionally and scrupulously acted in accordance with the law, and protected Defendant's rights. I take this diversion from the review of the search warrants because, in my view, the Detectives' professionalism and respect for the law permeated all their conduct. Their conduct for me is equally relevant to the search warrant issues.

After concluding the interview, the police arrested Defendant for a single count of theft of a motor vehicle. Ultimately, in December 2022, the Sussex County Grand Jury returned an indictment charging Defendant with Murder in the First Degree, Theft of a Motor Vehicle, and Theft Greater than $1,500.00.

When Milford Police stopped and detained Defendant, he had in his possession a Samsung Galaxy S10 cell phone. Following Defendant's interview, State Police filed requests for two search warrants. In one request, State Police asked for permission to "seize" Defendant's thumb print, which was required to access the phone. In the second request, State Police asked for permission to search the phone itself. A Magistrate granted both requests.

State Police attempted to search the phone. They used Defendant's thumb print to open it, but were able to access only parts of it, because most of the cell phone data had an additional layer of security, a Google password. This thwarted the trooper's efforts to access most of the cell phone's data and information. The

troopers manually searched what they could. They viewed three categories of data: text messages between Defendant and the victim, a call log, and a contact list. The troopers also determined that the contents of the device were associated with and had been backed up to Defendant's Google email address, ariley868@gmail.com.

The State Police continued the investigation, seeking a warrant to Google for the information backed up from the cell phone. A Superior Court judge granted the request for this warrant.

The fourth warrant, which a Superior Court judge also granted, allowed a second search of the full contents of the cell phone once the Google password was obtained and the full contents of the cell phone were accessed.

Defendant filed motions to suppress evidence obtained pursuant to all four search warrants. At the suppression hearing on May 6, 2024, I denied Defendant's first motion to suppress his thumb print for the reasons stated on the record.

I will address each of the three remaining challenged warrants *seriatim*, and I will detail additional facts as necessary. However, several preliminary comments are in order. First, I have some discomfort with the police's articulation of the crimes set forth. They varied from Abuse of a Corpse to "any violation of Title 11." For me, this was always about murder and whether probable cause existed to show a

murder occurred, and police should have labelled it as such. But also for me, substance prevails over form.

Second, it is clear to me the State Police struggled with the law governing search of electronic devices. They scrupulously observed time limitations. I will discuss this issue in more detail below, but in my opinion the State Police made substantial efforts to tie the time frames of their request to the time frames developed in their investigation. While not conclusive, this effort both shows me good faith and it puts any defects in the warrant process into the "overbroad warrant," and not the "general warrant," category. As such, I can suppress any improperly obtained evidence, but do not have to suppress all evidence.[9] I now address the three remaining search warrants.

## SEARCH WARRANT FOR DEFENDANT'S CELL PHONE DATED 02/7/20

On February 7, 2020, Detective Yeich drafted a search warrant for Defendant's Samsung Galaxy S10 cell phone. This warrant was intended to be used in conjunction with the warrant that authorized the Delaware State Police to compel the use of Defendant's thumb print to unlock his cell phone. Once accessed, the Delaware State Police intended to extract and download certain specified categories of data and information from the cell phone, as authorized by the warrant, within a

---

[9] *Taylor v. State*, 260 A.3d 602, 615 (Del. 2021).

specified time frame, as discussed further below.

This warrant was approved by a Magistrate at Justice of the Peace Court 2. It authorized police, in pertinent part, to do the following:

1.  Enter and search the listed cellular telephone ... described herein … for evidence of a potential crime(s), and or information to provide a cause or nature of death, as communications in the forms of text messaging, voice mails, call history, social media messages, contact lists, and internet searches on the listed electronic device within the time frame of 0001 hours on 01/18/2020 and 1400 hours on 02/07/2020.

2.  Data, and forensic examination thereof, stored by whatever means seized pursuant to paragraph 1 as described above to include registry entries, test messaging, voice mails, call history, social media messages, contact lists, temporary internet files, internet history files, connection logs, text messages, call history, location history or other evidence that the cell phone seized contains information that is in violation of criminal statutes contained within the Delaware Criminal Code, Title 11, and or any information that provides a cause or nature of death, within the time frame of 0001 hours on 01/18/2020 and 1400 hours on 02/07/2020.[10]

Defendant was taken to the Delaware State Police High Tech Crimes Unit ("HTCU"), where his fingerprint was used to open the phone. Once detectives had access to the phone, however, they discovered that it was protected by a second layer of security requiring the use of a passcode. This added layer of security prevented police from searching for all the data authorized by the warrant, and the HTCU detectives were unable to download the phone's contents. Detective Yeich was able

_____

[10]Search Warrant at 1.

to manually access certain areas of the phone that were included within the bounds of the search warrant. He was able to visually review three types of data: phone logs, contacts, and text messages. Because he was performing a manual search, he had to open the entire thread of text messages between the victim and Defendant in order to scroll down to those messages occurring on or after the warrant's start date of January 18, 2020. As a part of that process, he observed that the text message thread between the two had begun in October, 2019.

Defendant argues that this warrant constitutes a "general warrant" in that it fails the requirement that evidence searched for and seized must be described as particularly as possible. The language used in the warrant, argues Defendant, would allow the police unfettered access to Defendant's private information. Unlike the "general warrants" in *Buckham* [11] and *Taylor*,[12] however, this warrant (1) specifies the categories of data and information on the phone to be searched, (2) contains time limitations, and (3) is supported by probable cause as set forth within the four corners of the warrant, as discussed below.

## Specific Categories of Data and Information

This warrant, like that in *Thomas*, identifies the specific categories of data and information to be searched: text messages, voice mails, call history, social media

---

[11] *Buckham v. State*, 185 A.3d.

[12] *Taylor v. State*, 260 A.3d at 615.

messages, contact lists, internet searches, temporary internet files, internet history files, connection logs, and location history. It does not use the disfavored "any and all" or "including but not limited to" language. This certainly does not constitute Defendant's entire digital universe, nor did it allow police to have unfettered access to his cell phone. Rather, the categories of data and information to be searched were stated with particularity and limited law enforcement's access to only those areas of the cell phone. The multiple number of categories to be searched does not, *a fortiori*, mean that any one category of the search, or the search itself, was general or overbroad.

Moreover, as a practical matter, the police were quite limited in what they were able to retrieve from their search of the cell phone. They could only conduct a manual search of three categories of data: phone logs, contacts, and text messages. This is because an additional layer of security measures on the cell phone prevented HTCU from downloading its entire contents in digital format.

The specified categories of data and information requested show a clear nexus between the evidence being sought and the places to be searched. A search of text messages, voice mails, and call history were all supported by Defendant's own statement that he and the victim had communicated frequently since December 2019 by text messages and phone calls. A search of the contact list could confirm that Defendant had the victim listed as a contact, and the phone's location history could

11

help corroborate or disprove Defendant's claims about where he went before and after his sleepover at the victim's house, since Defendant himself told police that he had been at her house overnight on February 1 and left her home on February 2, 2020 with her vehicle.

Defendant admitted to police that he and the victim had been communicating via text messages and telephone calls. Many social media platforms allow communication via their own messaging and call applications. Defendant was not specific as to the exact means by which the two kept in touch, only that they utilized text messages and telephone calls. A friend of the victim, Gene Ellis, meanwhile, confirmed for police that she used electronic devices, including her cell phone, for voice communications, text communications, and social media communications.

### Time Limitation

The warrant has time limitations and states that, during his interview with the police, Defendant stated that he and the victim had reconnected in December 2019, exchanging numerous text messages and phone calls. Defendant also acknowledged that he was at her residence from February 1, 2020, through February 2, 2020, making him the last known person to see her alive.

The warrant notes that the victim's friend Gene Ellis last saw her on the morning of February 1, and that he and his wife had exchanged text messages with her around 10:00 p.m. that night. The affidavit of probable cause likewise establishes

12

that the victim worked her shift at Food Lion from 11:00 a.m. to 7:00 p.m. on February 1, but failed to appear for her scheduled shifts on February 2, 3, and 5.

Gene Ellis ultimately discovered the victim's body on February 5, 2020, and witnesses reported that her truck was missing. Defendant was subsequently located in possession of the truck at approximately 1:50 p.m. on February 7, and he acknowledged that he had been in possession of the truck since the time he left her house on February 2, claiming that he had her permission to borrow it. Defendant told police that he had attempted to contact the victim later in the day on February 2 and again on February 5 but received no response.

The time limit of the warrant began on January 18, 2020, which was two weeks before Defendant was taken into custody on February 7, 2020. This two-week period falls well within Defendant's own acknowledgment that he and the victim had been communicating since December 2019, and constitutes a reasonable and limited "look back" period for police to investigate the nature of Defendant's relationship with the victim in the leadup to her death. The time limit of the warrant ends on the date and at the approximate time that Defendant was taken into custody while in possession of the victim's truck. This time period includes several significant events, such as the last time Defendant acknowledged seeing the victim, the times he claimed to have attempted to contact her with no reply, and the date that her body was found.

## Probable Cause

In my view, the probable cause affidavit attached to the warrant request also establishes a nexus between the data to be searched and the likelihood that evidence of a crime would exist therein. Defendant confirmed that he and the victim had reconnected in December 2019, after which time they exchanged numerous text messages and phone calls. The victim was last seen alive (by someone other than Defendant) on the evening of February 1, after she had finished her shift at Food Lion. Her friend, Gene Ellis, saw her during the late morning hours that same day. He and his wife then exchanged text messages with her later that evening, around 10:00 p.m. Defendant told police that he and the victim had an "arrangement" which allowed him to take her vehicle on February 2. At 11:35 a.m. on February 2, a suspicious Facebook post was made on the victim's page about a male friend "coming to the rescue" and "helping her clean her home and treat her to breakfast." The victim then missed her work shifts at Food Lion on February 2, February 3, and February 5, the day on which her body was found. Defendant told police that he left the victim's house on February 2, driving her vehicle, and that his attempts to contact her via text message later that same day were unsuccessful. Defendant also told police that he attempted to contact the victim on February 5, but received no reply.

This timeline creates a reasonable inference that the victim was dead at least as of the time she was scheduled to begin her work shift on February 2. The fact that her body was found concealed in a closet, with large items placed on top of it, allows for a reasonable inference that her death was not the result of natural causes and that someone had made efforts to cover up a crime. The warrant explains that a search of certain categories of data, namely Defendant's text messages, contact lists, call history, location history, voice mails, and internet searches, was necessary, among other reasons, to look for evidence related to a potential crime(s), and or information to provide a cause or nature of death, of the victim.

## General Warrant v. Overbroad Warrant

Even if I were to find that some of the categories of information *requested* in the warrant (as opposed to those actually *found* on the phone) are overbroad and not supported by probable cause, this would not invalidate the entire warrant. Our Supreme Court in *Taylor* articulates the need to prevent investigators from "unconstitutional rummaging through the contents" of a smart phone.[13] The ruling did not, however, "make specific pronouncements about what is required in a search warrant for electronic devices for fear that we might tie the hands of

---

[13] *Taylor* at 615.

investigators."[14] The Court's desire to strike a balance is further demonstrated by its discussions about distinguishing a general warrant from one that is simply overbroad. "All fruits of a general warrant must be suppressed in their entirety, whereas an overbroad warrant, the less constitutionally offensive of the two, can be redacted as to the portions of the search for which no probable cause exist."[15]

While *Taylor* teaches that I cannot order limited suppression of evidence when a warrant is general, *Terreros* teaches that where the warrant is merely overbroad, I may rectify the situation by suppressing only those parts of the warrant that are not supported by probable cause.[16] I can redact portions of the warrant, or narrow the time limitations of the warrant, if I determine that some areas were overly broad.

Here, there is the additional practical consideration that only three categories of information were in fact found as a result of the warrant. The HTCU was unable to download the entire contents of Defendant's phone on February 8, 2020, because it contained additional layers of security. Therefore, Detective Yeich could gain only manual access to those portions of the phone that could be viewed using the defendant's fingerprint (call logs, contact lists, and text messages), all of which have a probable cause nexus within the affidavit. Police did

---

[14] *Id.* at 616.
[15] *Terreros v. State*, 2024 WL 193104, at *7 (Del. Jan. 18, 2024).
[16] *Taylor* at 617.

not access any other categories of data during that manual search of the phone.

At first blush the language contained in the application for the warrant and the accompanying affidavit of probable cause which allows for the search of "information that is in violation of criminal statutes contained within the Delaware Criminal Code, Title 11," appears to be overbroad. However, the sentence seeking such information ends with the language "any information that provides a cause or nature of death." In my view, this limits the scope of the referenced criminal statutes to those that would relate to the death of the victim, and the overbroad reference can be disregarded. The second page of the application and affidavit references the specific crime of Abuse of a Corpse, because, as is made clear in the affidavit, investigators had discovered the victim's body under suspicious circumstances and did not know how or if Defendant was involved in her death at the time. The facts laid out in the affidavit are also clear that Defendant was located driving her only known vehicle days after her body was found and days after she was last seen alive, carrying what appeared to be her residential house key.

I find that the February 7, 2020, search warrant for the cell phone contains specific categories of data and information and reasonable time limitations, and is grounded in probable cause. I also find that the warrant is not a "general warrant." Even if the warrant is viewed as overbroad, for example as it relates to the request

for Defendant's internet search history,[17] that issue is moot, because Defendant's phone was unable to be accessed beyond the call logs, text messages, and contact lists. Therefore, the evidence seized as a result of this warrant need not be suppressed, and I deny Defendant's Motion to Suppress with respect to this warrant.

## SEARCH WARRANT FOR DEFENDANT'S GOOGLE DATA DATED 03/21/2020

Despite the practical limitations of the search pursuant to the February 7, 2020, warrant, the limited manual search of Defendant's cell phone revealed that its data was backed up at 8:48 a.m. on February 7, 2020 to a Google drive account associated with the email address ariley868@gmail.com. On March 31, 2020, Detective Yeich drafted a search warrant for the data associated with the account ariley868@gmail.com stored by Google, Inc.[18]

The Warrant was approved by a Superior Court judge and authorized police to search and seize:

1. All records or other information containing the account information for the email address [ariley868@gmail.com], to include all information listed in the "Google My Account" screen. This is to include any stored data that would aid in identifying the user/owner of the listed Gmail account. If available, this is to include full name, date of birth, gender, physical address, alternate (recovery) email address, (recovery) telephone numbers, additional linked e-mail addresses or accounts and other identifiers, the date on which the account was created, the length of service, the types of service numbers,

[17] See discussion of Warrants dated March 21, 2020 and December 22, 2021, *post*.
[18] Search warrant at 1.

account status, all incoming or outgoing text messaging content, internet search history, photos, banking or cash transfer application, dating applications, and any other data spanning from February 1, 2020 through February 7, 2020 that may provide geographical information maintained in the above-described account.

2. Enter and search the listed Google account described in the application and affidavit for evidence connected to this death investigation, including communications in the forms of text messaging, voice mails, call history, and video recordings on the Gmail account ariley868@gmail.com within the timeframe of 0001 hours on September 1, 2019 and ending at 2359 hours on February 7, 2020.

3. All stored digital media files to include .jpg, .png, .jpeg, .mpg, .mpeg, .mp4, .avi, and any and all video and picture file extensions and files contained in ALL Google accounts (including Google drive and Google+ Photos) associated with the email address identified above within the time period of 0001 hours on February 1, 2020 and ending at 2359 hours on February 7, 2020.[19]

Defendant argues the March 31, 2020, warrant "fails the particularity requirement, is overbroad and lacking probable cause for the place to searched and the items to be seized."[20]

### Specific Categories of Data and Information

In my view, the categories of data and information on the cell phone to be searched and seized were specified with appropriate particularity. Detective Yeich listed the categories of ESI sought at a granular level. The warrant walks its reader

---

[19] Search Warrant at 1-2.
[20] Defendant's Motion to Suppress at 5.

through the specific categories of information, file types, communications, and apps which are sought.

Although at times the warrant uses the *verboten* language "any", "all", and "any and all," a careful reading shows that this language does not render the warrant either "general" or "overbroad." All the phrases "any," "all," or "any and all" modify a specified category of ESI, for example:

> …*any and all* video and picture file extensions and files contained in ALL Google accounts (including Google drive and Google+ Photos) associated with the email address identified above within the time period of 0001 hours on February 1, 2020, and ending at 2359 hours on February 7, 2020. (emphasis added).[21]

Thus, although the request uses the disfavored words, it is clear that Detective Yeich was not seeking the type of expansive search disfavored by our courts. This request does not grant the State the "capacity to creep into areas quite distant from probable cause."[22] This is not a request for *all* data and information on Defendant's cell phone; it is tailored to specific types of files associated with Defendant's email address. This reading of the warrant avoids the hyper-technical analysis disfavored by our courts.

---

[21] Search Warrant at 2.
[22] *State v. Waters*, 2020 WL 507703, at *4, (Del. Super. Ct. Jan. 30, 2020).

## Time Limitations

In my view, the time limitations set forth in the search warrant are appropriate. Much of the information sought was for the time frame of February 1 through February 7, 2020. Detective Yeich explains why this time frame is chosen in the affidavit of probable cause. This time frame is narrow in scope, running from the day Defendant admits to engaging in a sexual encounter with the victim until the day Defendant was apprehended by the police. Importantly, it includes the night victim likely died.

This warrant also sought a broader time limitation for the search of Defendant's *communications* with the victim: from September 1, 2019 through February 7, 2020. This broader time frame is supported by probable cause within the four corners of the warrant. Defendant told police he rekindled his relationship with the victim in the fall of 2019.[23] It is reasonable, based on the totality of the circumstances, that Defendant's communications with the victim would shed light on the nature of his relationship with her, and perhaps on the nature of their relationship at the time of her death. Such information is certainly relevant in an investigation into the victim's death. Thus, although this time frame is broader in scope than the time frame for other types of ESI, it is reasonable and supported by probable cause.

---

[23] Affidavit of Probable Cause at P 18.

## Probable Cause

In my view, the four corners of this warrant and the accompanying affidavit of probable cause contain sufficient statements establishing probable cause for all categories of ESI being requested.

The Detectives knew that a Google Account associated with the email address [ariley868@gmail.com](mailto:ariley868@gmail.com) was being used on Defendant's cell phone. However, they did not seek further information in the warrant application to verify that the email address was in fact Defendant's and was the username for the Google Account. Nonetheless, in my view it was reasonable, given the spelling of the email address, for the Detectives to assume in the affidavit of probable cause that the email address was in fact Defendant's and was the username for the Google Account.

The victim was last seen alive at work on February 1, 2020. Defendant admitted to having a sadomasochistic sexual relationship with the victim and to staying at her house the night of February 1 into February 2, 2020.[24] Another female interviewed during further investigation revealed that in the past she had engaged in sexual relationships with Defendant in exchange for money.[25] She elaborated that she had met Defendant on common dating apps and that during those encounters Defendant had been aggressive and overpowering.[26] The medical examiner was

___

[24] *Id.* at ¶19.
[25] *Id.* at ¶ 28.
[26] *Id.*

considering suffocation as a possible cause of death for the victim at the time the warrant was sworn.[27] The victim did not report to her scheduled work shift on February 2, 3, and 5, creating the reasonable inference that she had died sometime between February 1 and 2, the night Defendant acknowledged staying at her house.[28] One week later, Defendant was found in the victim's truck. [29]

The initial manual search of Defendant's phone pursuant to the February 7, 2020, warrant yielded text messages between Defendant and the victim including evidence of an exchange of money between Defendant and the victim.[30] The text messages were accompanied by an icon which read "view all". Wary of violating Defendant's rights, Detective Yeich once again acted professionally, in accordance with the law, and did not click on the icon, but instead prepared the March 31, 2020, Google warrant to properly obtain access to the data.[31]

A sufficient nexus of probable cause exists between the ESI sought and the statements contained in the affidavit of probable cause. The information sworn in Detective Yeich's affidavit and summarized above is sufficient to establish probable cause for the various categories of ESI searched.

---

[27] *Id.*
[28] *Id* at ¶ 13.
[29] *Id*. at ¶ 17.
[30] *Id* at ¶ 27.
[31] *Id*. at ¶ 26.

## General Warrant v. Overbroad Warrant

This warrant is not a "general warrant." It did not give the State unfettered access to Defendant's digital world, nor did it permit a search of all his data and information. Nor is this warrant overbroad. Therefore, the evidence seized as a result of this warrant need not be suppressed, and I deny Defendant's Motion to Suppress with respect to this warrant.

### SEARCH WARRANT FOR DEFENDANT'S CELL PHONE DATED 12/22/2021

On December 22, 2021, Detective Yeich drafted a warrant for a second search of Defendant's cell phone. This warrant was drafted after the HTCU underwent "forensic software updates" and was now able to extract previously unretrievable data and information from the cell phone.

This warrant authorized the police to do the following:

> 1.Enter and search the listed cellular telephone . . . described herein … for evidence of a potential crime(s), and or information to provide a cause or nature of death, as communications in the forms of text messaging, voice mails, call history, social media messages, contact lists, and internet searches, photos, payment apps, and location history on the listed electronic device within the time frame of 0001 hours on 10/20/2019 and 1400 hours on 02/07/2020.

> 2.Data, and forensic examination thereof, stored by whatever means seized pursuant to paragraph 1 as described above to include registry entries, test messaging, voice mails, call history, social media messages, contact lists, temporary internet files, internet history files, photos, payment apps, and location

24

history that the cell phone seized contains information that is in violation of criminal statutes contained within the Delaware Criminal Code, Title 11, and or any information that provides a cause or nature of death, within the time frame of 0001 hours on 10/20/2019 and 1400 hours on 02/07/2020.[32]

Like the first cell phone warrant, Defendant argues that the second cell phone warrant constitutes a "general warrant" in that it fails the particularity requirement. Defendant argues that the language in the warrant would allow unauthorized rummaging through Defendant's communications. I disagree. Like the first cell phone warrant, this warrant specifies the categories of information on the cell phone to be searched, contains a reasonable time limitation, and is supported by probable cause as set forth within the four corners of the warrant.

### Categories of Information

This warrant identifies specific categories of data and information to be searched: text messaging, voice mails, call history, social media messages, contact lists, internet searches, photos, payment apps, and location history. The disfavored "any and all" language is not used. In my view, these categories do not constitute Defendant's entire digital universe and do not give the police unfettered access to Defendant's cell phone.

---

[32] Search Warrant at 1.

There is a nexus between the evidence being sought and the places on the cell phone to be searched. As stated previously, a search of Defendant's text messages, voice mails, and call history were all supported by his own acknowledgment that he and the victim communicated. Defendant placed himself in the victim's house directly before her death. Accessing his cell phone location could help to corroborate or disprove his claim that he left the house on February 2, 2020. Defendant did not specify exactly how he communicated with the victim. It is possible that Defendant communicated with the victim via social media messaging and call apps. This is confirmed by Mr. Ellis, who told police that the victim used social media as a means of communication.

## Time Limitations

The warrant has a time limit beginning on October 20, 2019. This is earlier than the time limit in the first cell phone warrant. When the police accessed Defendant's phone under the first warrant, they found a message chain between Defendant and the victim that started on October 27, 2019. Police requested a start date an additional week earlier than this in an attempt to obtain more insight to the subjects' electronic communication. In my view, this extra week constitutes a reasonably limited "look back" period for police to investigate the nature of Defendant's relationship with the victim in the leadup to her death. The warrant

appropriately ends the time period to coincide with the date when Defendant was taken into police custody.

## Probable Cause

The probable cause affidavit for this warrant establishes a nexus between the data and information to be searched and the evidence sought. As stated above in this opinion with respect to the first cell phone warrant, the police had probable cause to seek information about the nature of Defendant's and the victim's communications. The police continued to have probable cause to search Defendant's photos after locating a photo of the victim through a search of his Google Account.[33] Defendant's text messages with the victim discussing electronic transfers of money establish probable cause to search payment apps.[34] The police also had probable cause to search his location history based on his own admission that he slept at the victim's house on February 1, 2020 but left on February 2, 2020.[35] Finally, police had probable cause to search Defendant's internet searches following the evidence produced from the March 21, 2020 Google Account warrant.[36]

## General Warrant v. Overbroad Warrant

I find that the December 22, 2021 warrant is neither a "general warrant" nor

---

[33] Affidavit of probable cause ¶ 31
[34] Id. at ¶ 24
[35] Id. at ¶ 17
[36] Id. at ¶ 29-30.

overbroad, but is based on particular, specified categories of data and information, appropriate time limitations, and probable cause. Therefore, the evidence seized as a result of this warrant need not be suppressed, and I deny Defendant's Motion to Suppress with respect to this warrant.

## CONCLUSION

For all the reasons discussed above, Defendant's three pending Motions for Suppression of Evidence from Search Warrants are **DENIED.**

**IT IS SO ORDERED**.

/s/ Craig A. Karsnitz
Craig A. Karsnitz

cc:     Prothonotary