IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ELIJAH COFFIELD, | § | |
| | § | |
| Defendant Below, | § | No. 288, 2023 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 2105000996 A/B (N) |
| | § | |
| Appellee. | § | |

Submitted: November 8, 2024
Decided: January 14, 2025

Before **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices.

## ORDER

After consideration of the brief and motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26(c), the State's response, and the Superior Court record, it appears to the Court that:

(1) In May 2021, a grand jury indicted the appellant, Elijah Coffield, and more than a dozen other alleged members of a street gang known as "NorthPak" for gang participation and numerous violent crimes. The charges against Coffield in the operative, November 2021 reindictment included gang participation; two counts of first-degree murder; five counts of attempted first-degree murder; first-degree reckless endangering; attempted assault in a detention facility; and multiple conspiracy and firearm-related offenses.

(2) The charges arose from an investigation into NorthPak and its suspected involvement in a series of violent crimes in the City of Wilmington. Investigators determined that NorthPak was a "hybrid criminal street gang,"[1] with no "clear code of conduct,"[2] that was motivated, as one former member testified, not by drugs or money but by "revenge" and "rep chasing."[3] In 2020, NorthPak was engaged in a violent feud with a rival Wilmington gang known as the M-Block Grimy Savages ("MGS").[4] The gangs used social media platforms such as Instagram and YouTube to communicate, for self-promotion, and to "intimidate [and] inflict fear amongst their opposing gangs."[5] Perceived social media slights ignited violence and turned individuals into targets.[6] NorthPak sought to kill those targets, or the targets' friends and family members, each killing considered a "score" adding to their side's total body count in the ongoing feud.[7] The investigation unearthed at least eighteen key members of NorthPak. Coffield and Gregory Wing were identified as "leaders" and "shooters" for NorthPak and were tried together.[8]

(3) By the summer of 2020, NorthPak was "on offense" against MGS, catalyzed by the 2019 murders of Rajion Dinkins and Christian Coffield, Coffield's

---

[1] App. to Opening Br. at A657–59.
[2] *Id.* at A657.
[3] *Id.* at A2708.
[4] *Wing v. State*, -- A.3d --, 2024 WL 3763376, at 1 (Del. Aug. 13, 2024).
[5] App. to Opening Br. at A647.
[6] *Wing*, 2024 WL 3763376, at *1.
[7] *Id.*; App. to Opening Br. at A683–84, A2584–87, A2603–04, A2728–29.
[8] App. to Opening Br. at A258891.

brother.[9]  NorthPak was actively seeking MGS-affiliated targets to kill so NorthPak could "feel like [they] were winning."[10]  To that end, NorthPak gang members often stole cars to "spin the block," a slang term meaning to drive around an opposing gang's territory, looking for targets.[11]  If the opportunity arose, NorthPak would do a "drill," a slang term for a shooting, including a drive-by shooting.[12]

(4)    Five such attacks resulted in Coffield's convictions for the crimes at issue in this appeal.  The first three occurred in close succession on the evening of September 8, 2020.  Early that morning, at approximately 4:00 a.m., a Bear, Delaware resident's Nissan Altima with tinted windows was stolen from his driveway while he was sleeping.[13]  Then, at around 7:00 p.m., seventeen-year-old Ol-lier Henry and nineteen-year-old Taquan Davis, both associated with MGS, were walking home from a memorial service along North Pine Street; they were accompanied by Antoinjsa Williams and another woman.  A car with tinted windows pulled up beside them, and two masked men opened fire on the group, which quickly dispersed.  Henry was struck by gunfire and Williams was grazed; Davis and the other woman escaped.[14]  Wilmington police officers responded to the scene and

---

[9] *Id.* at A742, A1984-85.

[10] *Id.* at A2728.

[11] *Id.* at A682, A706, A2618–19, A2707.

[12] *Id.* at A682.

[13] On September 16, 2020, Wing was arrested in that vehicle.  *Infra* ¶ 7.  A car consistent with the stolen Altima was involved in the three September 8 shootings.

[14] Investigators surmised that Davis was the primary target of the first September 8 shooting.  Although he survived that day, he did not survive the week.  Following the September 8 shootings,

found Henry unconscious, with gunshot wounds to his head and torso; he was later pronounced dead at Christiana Hospital. The aftermath of the Pine Street shooting was captured on surveillance cameras, and officers found three .22 caliber shell casings and one 9mm projectile at the scene.

(5)     A few minutes after the Pine Street shooting, at around 7:10 p.m., fifteen-year-old Javar Curtis, who had a "problem" with a NorthPak member the week before,[15] was walking home from his grandmother's house. While walking through Southbridge in Wilmington, Curtis observed masked individuals in a black Nissan Altima "looking at [him] real hard."[16] Fearing that the car's occupants were in NorthPak, Curtis crossed the street. He briefly evaded the Altima, but when he saw the car a second time, Curtis presumed that it was "looking for [him]," so he ran.[17] Curtis again dodged the car momentarily, but when it came upon him a third time, two occupants of the vehicle fired multiple shots at him. Curtis ducked and narrowly avoided being struck in the face. Curtis observed that one of the guns

---

Davis made several Instagram posts lamenting Henry's death and taunting NorthPak. On September 12, 2020, outside a store at the corner of Elm and Harrison Streets, Davis was shot and killed. No ballistics evidence was found at the scene, but three 9mm shell casings were recovered in a Hyundai Santa Fe that had been stolen earlier in the afternoon of September 12 and was later found abandoned in a wooded area. Wing, but not Coffield, was charged with Davis's murder. *Wing*, 2024 WL 3763376, at *2.

[15] App. to Opening Br. at A1221.
[16] *Id.* at A1207-13.
[17] *Id.* at A1210.

appeared to be a "9."[18] The shooting was captured on surveillance video, and police found four .22 caliber shell casings at the scene.

(6) Less than an hour later, around 7:56 p.m., Bryshawn Lecompte and Jiveer Green were driving in the area of 7th and Jackson Streets. Lecompte was considered a NorthPak "opp" because he was "best friends" with someone who had disrespected NorthPak in rap videos; Green was a friend of Lecompte's.[19] A dark-colored, four-door car pulled up next to them, and two men fired several shots into their car. The bullets missed Green but struck Lecompte. Lecompte drove quickly to St. Francis Hospital, where he was treated for gunshot wounds to his left leg and arm. Investigators recovered three 9mm shell casings and seven .22 caliber shell casings from the scene.

(7) On September 16, 2020, Delaware State Police officers observed a dark-colored Nissan Altima pull into a Wawa market on Philadelphia Pike in Wilmington. The car caught the officers' attention because it was driving erratically and at a high rate of speed. Officers conducted a registration check and learned that the vehicle had been reported stolen. Officers observed Wing exit the Altima and enter the Wawa. When he returned, officers converged on the vehicle. Wing fled but was apprehended not far away with a black 9mm Beretta firearm and eleven

---

[18] *Id.* at 1215.
[19] *Id.* at A2757–58, A813–14. NorthPak members referred to opposing gangs or individuals associated with opposing gangs as "opps." *Wing*, 2024 WL 3763376, at *2, n.15.

9mm rounds of ammunition in his possession. A search of the Altima recovered three spent 9mm shell casings.

(8) A firearms-identification expert testified that the projectile recovered at the scene of the Henry homicide, the 9mm casings recovered at the scene of the Lecompte shooting, and the 9mm casings recovered from the Nissan Altima had all been fired from the 9mm Beretta that was seized when Wing was arrested on September 16.[20] The ballistics evidence also showed that the same .22 caliber firearm was used at all three September 8 shootings, although that gun was never recovered.[21]

(9) The fourth shooting with which Coffield was charged occurred on September 23, 2020, when Wing was in custody following his arrest at the Wawa. At approximately 6:00 p.m. that evening, a delivery driver went into the pizza shop where he worked to pick up pizzas, leaving his black Honda SUV outside the shop with the engine running. When he returned, the vehicle was gone. The vehicle had two stickers on the back window.

(10) A few hours later, around 11:48 p.m. on September 23, Leland Stanley, Shareef Hamilton, and two others drove to a Dash In convenience store on Delaware

---

[20] App. to Opening Br. at A1622, A1634, A1641. Ballistics evidence also tied the 9mm Beretta to the September 12 homicide of Taquan Davis, with which Coffield was not charged. *Id.* at A1651; *supra* note 14.
[21] App. to Opening Br. at A1649.

6

Avenue in Wilmington. While they were inside the store, a dark-colored SUV drove through the parking lot with its windows down, which seemed to draw the group's attention. Hamilton and Stanley eventually exited the Dash In and were standing outside when two people approached on foot and began shooting at them. Hamilton was struck by multiple bullets and died; Stanley escaped without being shot. The shooters fled in a waiting vehicle. Police found six spent 9mm shell casings, one 9mm projectile, and one spent .380 caliber shell casing at the scene; they also recovered three 9mm projectiles from Hamilton's body. A ballistics expert concluded that the 9mm casings and projectiles had all been fired from a 9mm Smith & Wesson firearm that was later found in Maryland.[22] A gun matching the .380 caliber casing was never recovered.[23] The incident was captured on surveillance cameras and observed by two individuals who had been panhandling for money outside the store. Surveillance footage showed that the dark-colored SUV that had pulled through the parking lot had two stickers on the back window.

(11) The fifth and final shooting at issue in this case occurred the following day and culminated in Coffield's arrest. On the afternoon of September 24, 2020, Marquise Merchant parked his car behind his mother's house in Chester, Pennsylvania while he was buying food from a nearby food truck. Merchant's

---

[22] *Id.* at A2497–98.
[23] Coffield told former NorthPak member Stanley Jones that he had used a "38" that would fire only one shot at the September 23 shooting at the Dash In. *Infra* ¶ 22.

mother's house was near NorthPak member Amire Pierce's residence. The car was a silver Volvo sedan with tinted windows. Merchant left his keys and a loaded 9mm Taurus G3 handgun in the car. Within minutes of parking his car, Merchant saw it "flying down the street."[24] Merchant had Federal and Hornady ammunition for the Taurus 9mm gun.

(12) Sakai Clark had posted photos and videos paying homage to MGS-affiliated shooting victims. A few hours after Merchant's silver Volvo was stolen in Chester, Clark and another individual were driving on Maryland Avenue in Wilmington when shots were fired into their car from a silver Volvo with Pennsylvania tags. Clark was struck by bullets but survived. Officers responded to a shots-fired report and attempted to apprehend the Volvo in the streets of Wilmington. When the Volvo was momentarily cornered in a dead-end street, an officer looked through an open door and observed one of the occupants and a pair of crutches in the back seat. The Volvo escaped by side-swiping some vehicles, with officers in pursuit, but the officers gave up the chase for public-safety reasons when the Volvo exceeded 100 miles per hour on I-95.

(13) Moments later, a police officer was returning home to Lea Boulevard Apartments after hearing about the car chase over his radio. He saw the silver Volvo parked in the apartment complex and observed an individual hobble away from the

---

[24] App. to Opening Br. at A2156.

vehicle on crutches. The officer followed the individual, who was NorthPak member Markel Richards, and took him into custody.

(14) Detective Kevin Nolan and additional officers arrived and began canvassing the area around the apartment complex for surveillance videos. Video from a nearby Ring camera depicted four individuals walking between two houses on 39th Street.[25] As officers were waiting for a K-9 unit to arrive to search for the suspects, Detective Nolan received a call informing him that a resident had reported suspicious individuals outside her house near 36th Street and Washington Street. He drove to the area and found two people resembling those depicted in the Ring video. He and another officer arrested those two individuals, who were Coffield and JShawn Edwards. While Coffield was handcuffed in the back of a police car, an officer observed him attempting to use a cell phone. The officer seized the phone, which was later determined to belong to Edwards.

(15) An evidence detective officer collected a Hornady 9mm shell casing near the area depicted on the Ring video. Upon closer review, the video appeared to show a shell casing falling to the ground when Coffield fumbled with his waistband. Ballistics evidence showed that the casing recovered near the scene of Coffield's arrest and five of the six 9mm casings recovered at the scene of the

---

[25] The video also recorded one of the individuals yelling something to "Kels," which was the nickname of Markel Richards, the individual who was arrested as he hobbled away from the Volvo.

9

Maryland Avenue shooting had been fired from the same weapon, which was never recovered.[26] The sixth 9mm casing from Maryland Avenue and the 9mm casings found at the Dash In shooting had been fired from the 9mm Smith & Wesson that was later found in Maryland.[27]

(16) Photos posted to Coffield's Instagram account on September 24 depicted a Taurus handgun like the one Merchant had in his Volvo when it was stolen that day. Instagram messages from Coffield's account indicated that he had "played ball" and been involved in a "high speed."[28]

(17) Coffield's social media account also incriminated him as to the September 8 and September 23 shootings. Less than two hours before the September 8 shooting spree began, Wing's brother sent an Instagram message to Coffield informing Coffield that "opps" were out "on Pine" and telling Coffield to tell Wing.[29] Coffield asked if police were in the area, to which Wing's brother responded that they were not. Coffield responded that he was going to "grab [his] joint," a slang term for a firearm.[30] Coffield then messaged Wing, informing Wing that opps were "out," telling Wing that Coffield had to "grab [his] ball"[31]—another slang term

---

[26] App. to Opening Br. at A2509–10.
[27] *Supra* ¶ 10; Appendix to Opening Brief at A2511–13.
[28] *Id.* at A2174–75.
[29] *Id.* at A1169-70.
[30] *Id.* at A1171-72.
[31] *Id.* at A1175.

10

for a firearm—and urging Wing to "hurry up."[32]  Wing sent Coffield a selfie-style photo of Wing with a loaded gun magazine.[33]  About an hour before Henry's murder, Coffield told Wing that he was "out back," to which Wing responded "[h]ere I come brody."[34]

(18)  Shortly before noon on September 23, 2020, the day that Hamilton was murdered at the Dash In, a NorthPak associate sent Coffield an Instagram message asking Coffield where he was, to which Coffield responded "riding" and "tryin to ball as usual."[35]  That afternoon, at approximately 3:41 p.m., Coffield sent JShawn Edwards messages asking Edwards where he was, to which Edwards responded that he was "riding" with his brother.  Later in the exchange, Edwards and Coffield referred to being in stolen cars, and the messages suggested that Coffield was picking up Edwards in a stolen car at approximately 4:28 p.m. that day.  Coffield also messaged another NorthPak associate that he was in a stolen car at approximately 11:05 p.m. that night, less than an hour before Hamilton's murder.[36]  Other messages

---

[32] *Id.*

[33] *Id.* at A1180–81.  During this timeframe, Wing also sent photos to NorthPak associate Caleb Lancaster of Wing with a loaded firearm magazine and Wing holding a firearm that appeared to match the 9mm Beretta that was used in the September 8 shootings, and that was in Wing's possession when he was arrested at the Wawa on September 16. *Id.* at A1189.  Following the September 8 shootings, Wing made various Instagram posts depicting a Beretta 9mm firearm and made posts and sent messages appearing to take credit for Henry's murder. *Wing*, 2024 WL 3763376, at *3.

[34] App.to Opening Br. at A118182.

[35] *Id.* at A1790.

[36] Moreover, approximately an hour and a half after the black car drove through the Dash In parking lot, Coffield messaged an unidentified woman that he was in a black car.

11

indicated that Coffield was also with Markel Richards at the time of the Dash In shooting. And approximately eleven hours after the Dash In shooting, Coffield posted on Instagram: "If ya didn't retaliate for your guys, STFU."[37]

(19) Among the more than 50 witnesses who testified during the fourteen-day trial was former NorthPak member Stanley Jones. Jones testified that he, Wing, and Coffield committed the September 8 shootings. Jones said that he stole the Nissan Altima that day, that Wing was the driver for all three of those shootings, and that Jones and Coffield were in the front passenger and back seats, respectively. Describing the Pine Street shooting, Jones testified that they were "spinning" when they spotted Henry, Taquan Davis, and some females.[38] He said that Wing had a Beretta and Coffield had a .22 caliber gun, both of which Jones had loaded. Wing stopped next to Henry and Davis, reached over Jones, and fired the Beretta. Jones was unsure whether Coffield had fired the .22 caliber gun, because the noise of the Beretta was so loud. Jones testified that they tossed shell casings from the car after they drove away from the scene of Henry's murder.

(20) Jones testified that they saw "Var from East," which was Javar Curtis's Instagram name, a few minutes later. Wing positioned the car so that it was clear to shoot, and Wing and Coffield shot at Curtis.

---

[37] App. to Opening Br. at A3025–26.
[38] *Id.* at A2748.

(21)  As they continued on, they saw Lecompte and a passenger sitting in a car at a red light.  Jones said that Lecompte was best friends with Sakai Clark, who was an "opp" because he had disrespected NorthPak in rap videos.[39]  Jones testified that when they first saw LeCompte and his passenger, they were in a single lane of traffic and not in a position to shoot, so Wing followed Lecompte's car to a second red light.  When they got close enough, Jones stuck his arm out of the window and fired several shots with the Beretta, and Coffield fired several shots with the .22 caliber gun.[40]

(22)  As to the September 23 shooting at the Dash In, Jones testified that Coffield told him that Coffield had stolen a car and was with Markel Richards and JShawn Edwards during the shooting.[41]  Coffield told Jones that Richards was driving and that there had been some confusion about whether the people at the Dash In were opps or not.  But Edwards was eager to engage in a shooting in order to enhance his reputation within NorthPak, so he and Coffield got out of the car and shot at the people outside the Dash In.  Coffield told Jones that he had a .380 caliber

---

[39] *Id.* at A2757–58.

[40] Jones also testified that he had stolen the Hyundai Santa Fe tied to Davis's murder; he was with Wing when Wing shot Taquan Davis with the 9mm Beretta on September 12; and they then abandoned the Hyundai near Coffield's house.

[41] Like Jones, Amire Pierce also testified that Coffield, Edwards, and Richards were present for the Dash In shooting, and that Richards was driving.  Pierce said that Richards often drove when NorthPak engaged in shootings.

gun that would only fire one shot and that they ditched the stolen car in a park on the north side of Wilmington.

(23) Jones testified that Coffield also told him about shooting Clark on September 24. Jones reported that Coffield said that he was with Edwards and Richards in a stolen car, and Richards was driving. When they saw Clark in another car, Coffield shot into the other car. Coffield "rant[ed] and rav[ed]" about how Richards was a great driver and maneuvered very well during a high-speed chase with police following the shooting.[42] Coffield said that after the chase they left the car on foot, went to someone's house, threw the gun in the bushes near a school, and then were walking nearby when police caught them.[43] Jones testified that Coffield said he was communicating with his mother after his arrest about trying to retrieve the gun. The State also played prison phone calls in which Coffield seemed to be giving his mother instructions about how to find the gun. Police searched for, but did not find, a gun in the area.

(24) A Superior Court jury found Coffield guilty of gang participation and all the charges against him arising from the five shootings on September 8, 23, and 24, 2020, including the Henry and Hamilton murders; the attempted murders of Davis, Curtis, Lecompte, Green, and Clark; and first-degree reckless endangering as

---

[42] App. to Opening Br. at A2782.
[43] Amire Pierce also testified that Coffield and Edwards claimed that they shot Clark.

14

to Leland Stanley. The jury found Coffield not guilty of an attempted assault in a detention facility charge and a related conspiracy charge. On August 11, 2023, the Superior Court sentenced Coffield to life imprisonment for each of the murder charges and many decades in prison for the other offenses.[44]

(25) In this direct appeal, Coffield's counsel has filed a brief and a motion to withdraw under Supreme Court Rule 26(c). Coffield's counsel asserts that, based upon a conscientious review of the record, there are no arguably appealable issues. Counsel informed Coffield of the provisions of Rule 26(c) and provided him with a copy of the motion to withdraw and the accompanying brief. Counsel also informed Coffield of his right to supplement counsel's presentation. Coffield responded with points he wanted to present for the Court's consideration, which counsel included with the Rule 26(c) brief. The State has responded to the Rule 26(c) brief and argues that the Superior Court's judgment should be affirmed.

(26) When reviewing a motion to withdraw and an accompanying brief under Rule 26(c), this Court must be satisfied that the appellant's counsel has made

---

[44] Coffield was charged with five counts of possession of a firearm by a person prohibited ("PFBPP"), three of which were for possessing a gun on September 8, 2020. After the jury's verdict on the other charges, the Superior Court found Coffield guilty of PFBPP but asked for a memorandum addressing whether a defendant may be convicted of separate counts of PFBPP for possessing the same gun on the same day. The State later moved to dismiss two of the September 8 PFBPP charges, and the court granted the motion. At sentencing, however, the court sentenced Coffield for all five PFBPP counts, and the Superior Court record appears to reflect a "guilty" disposition of all five PFBPP counts. Accordingly, the Superior Court record and sentence order must be corrected to reflect the dismissal of two of the PFBPP counts.

15

a conscientious examination of the record and the law for arguable claims.[45]  This Court must also conduct its own review of the record and determine whether "the appeal is indeed so frivolous that it may be decided without an adversary presentation."[46]

(27)  Coffield challenges the admissibility of evidence obtained from his Instagram account and the cell phone that was in his possession when he was arrested, arguing that the search warrants under which the evidence was obtained were not supported by probable cause and did not satisfy the particularity requirement.  Because Coffield's counsel did not file a motion to suppress in the Superior Court as required by Superior Court Rule of Criminal Procedure 12(b), the Superior Court did not hold a suppression hearing or make any ruling regarding the constitutionality of warrants.  "This Court has held that in the absence of a motion to suppress and a pretrial suppression hearing, there is not an adequate record upon which to review [a] suppression claim."[47]  The scope of our review is therefore limited to review for plain error.[48]  "Plain errors are 'material defects' that are apparent on the face of the record and that 'are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which

---

[45] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 442 (1988); *Anders v. California*, 386 U.S. 738, 744 (1967).
[46] *Penson*, 488 U.S. at 82.
[47] *Loper v. State*, 2020 WL 2843516, at *2 (Del. June 1, 2020).
[48] *Id.*

clearly show manifest injustice.'"[49]  For the reasons discussed below, we find no plain error in this case.

(28)  Coffield asserts that the warrants to search his Instagram account and the phone at issue were not supported by probable cause.  He also argues that the warrants did not satisfy the particularity requirement; specifically, he contends that the warrants were so overbroad as to the data categories and date ranges to search that they constituted general warrants.[50]  The State has provided three search warrants, and their supporting affidavits, relating to Coffield's claims.  The first was issued on September 18, 2020, by a United States magistrate judge, based on an affidavit of probable cause submitted by a federal law enforcement officer (the "Federal Instagram Warrant").  The Federal Instagram Warrant sought information maintained by Facebook, Inc., which owned Instagram, LLC, pertaining to Coffield's Instagram account for the period July 29 through September 18, 2020.  On February 26, 2021, a Superior Court judge issued a second warrant pertaining to Coffield's Instagram account, for the date range September 15 to September 24, 2020 (the "State Instagram Warrant").  On September 30, 2020, a Justice of the Peace Court magistrate issued a warrant to conduct a forensic examination of the

[49] *Id.*

[50] To the extent that Coffield contends that warrants to search other NorthPak members' Instagram accounts were unconstitutional, Coffield has not established that he has standing to challenge those searches.  *See United States v. Zelaya-Veliz*, 94 F.4th 321, 333 (4th Cir. 2024) (holding that appellants did not have standing to challenge a warrant to search Facebook accounts belonging to the appellants' co-conspirators who were not parties to the appeal).

Apple iPhone that was in Coffield's possession when he was arrested on September 24, 2020 (the "iPhone Warrant"), for the period September 1 to 24, 2020.

(29)   "The United States and Delaware Constitutions protect the right of persons to be secure from 'unreasonable searches and seizures.'"[51]   The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[52]

Thus, a search warrant must "be supported by probable cause and describe the places and things to be searched with particularity."[53]   Coffield asserts both probable cause and particularity-based challenges to the warrants.

(30)   To satisfy the probable cause requirement, a "warrant application must contain sufficient facts—viewed under the totality of the circumstances—to allow a neutral magistrate to conclude that there is a 'fair probability' both that a crime has been committed and that evidence of that crime will be found in the particular place

---

[51] *Flonnory v. State*, 109 A.3d 1060, 1063 (Del. 2015) (quoting U.S. CONST. amend. IV; DEL. CONST. art. 1, § 6)).

[52] U.S. CONST. amend. IV; *see also* Del. Const. art. I, § 6 ("The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.").

[53] *Terreros v. State*, 312 A.3d 651, 661 (Del. 2024) (emphasis omitted).

identified in the warrant."[54] That is, in addition to facts sufficient to allow a judicial officer to conclude that a crime occurred, the affidavit must articulate sufficient probable cause to conclude that evidence will be found in a particular location—in other words, the affidavit must "identif[y] a nexus between the evidence sought and the place to be searched."[55]

(31) A search warrant must also satisfy the particularity requirement, "which is fundamental and performs its own work in protecting against unreasonable searches and seizures."[56] To pass constitutional muster, the warrant itself must describe the things to be seized and the places to be searched with as much particularity as the circumstances reasonably allow.[57] The warrant must authorize a search that is no broader than the probable cause on which the warrant is based.[58]

(32) Turning to Coffield's arguments in this case, we conclude that Coffield has not demonstrated that he has standing to challenge the search of the cell phone. "Only persons with standing may challenge the legality of a search or seizure."[59] "A defendant bears the burden of proof of showing that he has standing to contest an

---

[54] *Id.* at 661-62 (citations omitted); *see also Buckham v. State*, 185 A.3d 1, 16 (Del. 2018) (stating that the affidavit supporting a warrant application must contain facts adequate for a judicial officer to form a reasonable belief that a crime has been committed and the property to be seized will be found in a particular place).

[55] *Terreros*, 312 A.3d at 662.

[56] *Id.*

[57] *Id.*; *Buckham*, 185 A.3d at 18; *Wheeler v. State*, 135 A.3d 282, 305 (Del. 2016).

[58] *Buckham*, 185 A.3d at 18; *Wheeler*, 135 A.3d at 299.

[59] *Cooper v. State*, 2013 WL 5874813, at *2 (Del. Oct. 30, 2013).

unlawful search, and to have standing he must show that he had a reasonable expectation of privacy in the [property] searched."[60] In determining whether a defendant has made such a showing as to a cell phone, courts have considered factors such as ownership, possession, use, or an otherwise legitimate privacy interest in the phone.[61] Although Coffield had the iPhone at issue in his possession when he was in the police car after he and Edwards were arrested together, the phone apparently belonged to Edwards.[62] On the record before the Court, we find no plain error as to the cell phone search, based on Coffield's failure to establish facts suggesting that he has standing to challenge that search.

---

[60] *Washington v. State*, 1994 WL 716044, at *2 (Del. Dec. 20, 1994). *Cf. also State v. Mills*, 2022 WL 17248930, at *6 (Del. Super. Ct. Nov. 28, 2022) (holding that defendant relinquished his reasonable expectation of privacy in a phone that he abandoned in another person's backyard and therefore would not have had standing to challenge a search of the phone, had his counsel filed a motion to suppress), *aff'd*, 2023 WL 5424824 (Del. Aug. 23, 2023).

[61] *See United States v. Gatson* 744 F. App'x 97, 99-100 (3d Cir. 2018) (holding that defendant lacked standing to seek suppression of information obtained from two cell phones—one that belonged to another person and a "burner phone not associated with any subscriber information but attributed to [the defendant by the government]"—because he did not establish that he personally held a legitimate expectation of privacy in either phone; did not claim that he ever possessed, used, or had any privacy interest in the burner phone; and the government's attribution of the phone to the defendant did not meet the defendant's burden to demonstrate his expectation of privacy in the phone); *see also United States v. Beaudion*, 979 F.3d 1092, 1099 (5th Cir. 2020) (holding that defendant did not establish that he had a reasonable expectation of privacy in his girlfriend's cell phone and its location data, even though he purchased the phone, had permission to use it, accessed his Facebook account from the phone, and used the phone to capture intimate videos of himself and his girlfriend); *United States v. Turner*, 781 F.3d 374, 382 (8th Cir. 2015) (holding that defendant had not met his burden to establish standing to challenge searches of phones belonging to others because he did not "assert that he owned, possessed, or used either of these cell phones; nor does he describe any other legitimate expectation of privacy in these phones or the [location information] obtained from them").

[62] *See* Appendix to Opening Brief at A2137.

(33) We also find no plain error as to the Instagram warrants. We address Coffield's probable cause and particularity arguments in turn.

(34) This Court gives great deference to the probable cause determination made by the judicial officer who issued a warrant.[63] The applications for both the Federal Instagram Warrant and the State Instagram Warrant contained facts sufficient to allow a judicial officer to conclude both that crimes had occurred and that evidence of the crimes would be found in the targeted Instagram account. The applications detailed the investigation of NorthPak and its deadly feud with rival gangs; provided facts showing Coffield's involvement; and explained in detail, with specific examples and photos, how gang members including Coffield used Instagram to promote NorthPak, communicate with other NorthPak members about criminal activities, and taunt and disrespect rival gang members, leading to violence. The factual details in these warrants create a much tighter nexus between the crimes and Coffield's Instagram account than did the "generalized suspicions" connecting the defendant's phone to the crime in *Buckham*.[64] Coffield has not shown that the

---

[63] *Cooper v. State*, 228 A.3d 399, 404 (Del. 2020); *Buckham*, 185 A.3d at 16.

[64] *See Buckham*, 185 A.3d at 17 (holding that statement that "criminals often communicate through cellular phones" and allegation that, after an arrest warrant had been issued for Buckham's arrest, he posted on social media about getting arrested did not provide a substantial basis to support a probable cause finding). In contrast, and much more akin to the circumstances here, see *United States v. Zelaya-Veliz*, 94 F.4th 321, 335-36 (4th Cir. 2024), in which the affidavits supporting the search warrants at issue showed a gang's use of Facebook in the criminal enterprise.

21

judicial officers who issued the warrants erred in finding probable cause to issue the warrants.

(35) We also find no plain error as to the requirements that a warrant describe the items to be searched for and seized with as much particularity as the circumstances reasonably allow and be no broader than the probable cause on which it is based.[65] This Court's case law addressing particularity and overbreadth in the context of digital searches has centered on warrants to search electronic *devices*, such as smartphones and computers,[66] rather than on online platforms such as social media accounts. As we observed in *Buckham* and *Taylor*, echoing the United States Supreme Court's observations in *Riley v. California*,[67] smartphones store an unprecedented volume of private information, and a top-to-bottom search of a smartphone can permit the government access to far more than the most exhaustive search of a house.[68] Smartphones "collect in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record."[69] For purposes of our

---

[65] *See Buckham*, 185 A.3d at 16 ("As for Buckham's challenge to the warrant's particularity and breadth, we review those questions *de novo*. But because he did not raise this challenge in the Superior Court, we will take notice of an error only if it is plain." (citation omitted)).

[66] *E.g.*, *Terreros v. State*, 312 A.3d 651, 655 (Del. 2024), *Thomas v. State*, 305 A.3d 683, 687 (Del. 2023); *Taylor v. State*, 260 A.3d 602, 604 (Del. 2021); *Buckham*, 185 A.3d at 4; *Wheeler*, 135 A.3d at 284.

[67] 573 U.S. 373, 396-97 (2014).

[68] *Taylor*, 260 A.3d at 613; *Buckham*, 185 A.3d at 18.

[69] *Taylor*, 260 A.3d at 613 (alteration and internal quotation to *Riley*, 573 U.S. at 394, omitted)).

analysis, we have considered our precedents addressing warrants as to electronic devices and case law from other jurisdictions addressing warrants as to social media accounts.

(36) The Instagram warrants at issue here differ in important respects from those in the cases in which we have found that warrants to search smartphones lacked particularity or, more specifically, were so overbroad as to constitute general warrants. Of those precedents, we focus on three recent decisions: *Taylor*, *Terreros*, and *Thomas*.

(37) *Taylor* is the most factually similar to this case—among other crimes, Taylor was convicted of the gang-related murder of Brandon Wingo, in an earlier phase of the gang war underlying Coffield's convictions.[70] We reversed Taylor's conviction, holding that a warrant to search two smartphones was an unconstitutional general warrant, and the Superior Court therefore erred by denying Taylor's motion to suppress evidence collected from the smartphones.[71] We determined that the warrant could have limited the search to the categories of data "tied specifically to

---

[70] *Taylor*, 260 A.3d at 605-06. Hand gestures signifying disrespect to Wingo were among the signs that NorthPak members used to communicate their alliance with NorthPak and taunt MGS, and MGS similarly used hand gestures paying homage to Wingo to represent their gang and taunt NorthPak.

[71] *Id.* at 604.

the probable cause supporting the warrant" and to a relevant time frame, but failed to do so.[72]

(38) In *Terreros*, this Court held that a warrant to search the defendant's cell phone was an unconstitutional general warrant and reversed his conviction for sexual offenses against a child.[73] We observed that, "[a]lthough the only nexus between the alleged crime and the phone was Terreros's internet history," the warrant authorized police to search his "messages, messaging apps, photos, videos, internet search history, GPS coordinates, and incoming and outgoing calls."[74] Moreover, the "warrant did not identify any dates limiting the scope of the search," even though the application sought authorization to search data from only a five-day period.[75]

(39) In *Thomas*, the Court held that the Superior Court did not abuse its discretion when it found that a warrant obtained in a stalking investigation was overbroad but not general because it identified the specific types of data to be searched and those categories were supported by probable cause.[76] As we stated in *Terreros* about *Thomas*, "[c]ritically, we also held that the phone was an

---

[72] *Id.* at 616; *see also id.* ("Although the record is not entirely clear, investigators apparently extracted almost all data from Taylor's smartphones from an eleven-year time span, and then searched without restriction for evidence of criminal conduct.").

[73] 312 A.3d at 655. Like Taylor, Terreros sought suppression in the Superior Court. *Id.* at 657-58.

[74] *Id.* at 655.

[75] *Id.*

[76] 305 A.3d at 702.

instrumentality in the stalking crime."[77]  Specifically as to this point, in *Thomas* we distinguished *Wheeler*, *Buckham*, and *Taylor* and wrote:

> We invalidated the warrants in *Wheeler*, *Buckham*, and *Taylor* because investigators had a more precise description of the places to be searched than was provided in the warrant, and there was nothing in those cases to support an inference that evidence would have been found in the less precise locations which the warrants authorized law enforcement to search.  Therefore, the warrants in those cases authorized unconstitutional exploratory rummaging.  Here, the basis for searching Thomas's Pink iPhone, and certain sections of the device, is apparent from Detective Herrera-Cortes's affidavit.  The Pink iPhone was believed to be the instrument of the crime of Stalking.  In other words, law enforcement had reason to believe that the phone number associated with the Pink iPhone belonged to Thomas and had been used to contact the victims via phone calls, text messages, and messaging on social media applications.[78]

We also distinguished *Wheeler*, *Buckham*, and *Taylor* on the basis that the Thomas warrant contained an eleven-month temporal limitation, concluding that "[a]lthough this time frame surpassed that supported by probable cause in [the supporting] affidavit, it was not unmoored from the facts of the case."[79]

(40)  So, were the Federal Instagram Warrant and the State Instagram Warrant so overbroad and lacking in particularity that the admission of evidence from Coffield's Instagram account constitutes plain error?  They were not.

---

[77] *Terreros*, 312 A.3d at 667.

[78] *Thomas*, 305 A.3d at 702-03 (citations omitted).

[79] *Id.* at 703.  As other courts have observed, a broader criminal enterprise may support a search of broader scope.  *E.g.*, *United States v. Zelaya-Veliz*, 94 F.4th 321, 338-340 (4th Cir. 2024).

25

(41) First, both warrants included temporal limitations that were well supported by the probable cause on which the warrants were based. The Federal Instagram Warrant, which the magistrate judge issued on September 18, 2020, directed Facebook Inc. to disclose to the government information for the period July 29 to September 18, 2020.[80] The supporting affidavit included specific examples—involving Coffield's Instagram account, and within the date range authorized by the search warrant, indicating that Coffield's Instagram data from that period contained evidence of criminal activity.[81] The State Instagram Warrant, which a Superior Court judge issued on February 26, 2021, authorized Wilmington police to seize the "entire contents" of Coffield's Instagram account from September 15 to 24, 2020.[82] Like the affidavit supporting the Federal Instagram Warrant, the affidavit supporting the State Instagram Warrant included specific examples—involving Coffield's Instagram account, and within the date range authorized by the search warrant—indicating that Coffield's Instagram data from that period contained evidence of illegal gang participation and possession of guns and stolen cars.[83] The temporal

---

[80] App. to State Response at B28, B32.

[81] *Id.* at B14–15 (example from July 29, 2020); *id.* at B16-19 (examples from August 7-September 2, 2020); *see also id.* at B19-21 (providing examples of use of the Instagram account between September 14 and 18, 2020, and how additional data might assist law enforcement in apprehending Coffield).

[82] *Id.* at B41–42.

[83] *Id.* at B60–62.

26

limitations in both warrants are significant and are well tailored to the probable cause supporting the warrants.

(42) As to the breadth of the categories of data to be seized from Facebook/Instagram and searched, it is not clear that the warrants imposed any limitations. As noted above, the State Instagram Warrant applied to the "entire contents" of the account. The Federal Instagram Warrant lists seventeen categories of information that Facebook Inc. was required to disclose—the categories cover a vast range of data types, and it is not clear what data from the account would be beyond the warrant's scope, if any.[84] But as compared to *Wheeler*, *Buckham*, *Taylor*, and *Terreros*, the facts in the probable-cause affidavits here support a search of a much broader range of data categories within the Instagram account. The affidavits detailed how NorthPak and Coffield used Instagram Live, location tagging, the posting of pictures and videos, comments, direct messaging, and account naming (and the changing of account names) to further their illegal gang activities and other crimes. Indeed, the facts here arguably support the conclusion that Coffield's Instagram account was an instrumentality of Coffield's gang participation.[85] Coffield has not identified which categories of data within the Instagram account were purportedly beyond the scope of the probable cause established by the warrant

---

[84] *Id.* at B28–30.

[85] *See supra* ¶ 39 (discussing use of phone as instrumentality of stalking in *Thomas*).

applications. In the circumstances of this case, we find no plain error as to the Instagram warrants.[86]

(43) We have carefully reviewed the record and conclude that, with the exception of the PFBPP issue addressed on page 15 of this order, Coffield's appeal is wholly without merit and devoid of any arguably appealable issue. We also are satisfied that Coffield's counsel has made a conscientious effort to examine the record and has properly determined that Coffield could not raise another meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the matter is REMANDED to the Superior Court for correction of the record and sentencing order to reflect dismissal of two of the counts of possession of a firearm by a person prohibited; the judgment of the Superior Court is otherwise AFFIRMED. The motion to withdraw is moot. Jurisdiction is not retained.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

---

[86] *Cf. Zelaya-Veliz*, 94 F.4th at 338-39 (holding that warrants to search gang members' Facebook accounts were not insufficiently particularized, and stating that the "wide-ranging nature of the sex trafficking conspiracy under investigation further mitigates any concern that the scope of the warrant was impermissibly broad" and "the affidavit showed how the conspirators were using Facebook extensively to communicate with co-conspirators, victims, and customers in furtherance of the conspiracy"); *State v. Sardina-Padilla*, 7 N.W.3d 585, 598-99, 601-02 (Minn. 2024) (holding that warrant authorizing search of "all content" of defendant's Facebook account from April 1, 2019 to June 24, 2019 was sufficiently particularized, although it "approache[d] the outer edge of the particularity requirement").